# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

Hon. Guy Reschenthaler, a member of
the U.S. House of Representatives, et al.,

      Plaintiffs,

v.

Al Schmidt, in his official capacity
as Secretary of the Commonwealth, et
al.,

      Defendants.

Civil No. 1:24-CV-01671

**Memorandum of Law in Support of
Motion for Temporary Restraining
Order or Preliminary Injunction**

---

## Table of Contents

BACKGROUND.................................................................................................... 1

A.   Congress enacts UOCAVA in 1986 regulating military and overseas
     citizens voting............................................................................................ 1

B.   Congress enacts HAVA in 2002 requiring voter registration
     information verification. ........................................................................... 2

C.   Pennsylvania enacts UMOVA in 2012, but it is silent on HAVA's
     voter registration information verification requirements applying to
     UOCAVA voters. ...................................................................................... 8

D.   The Defendants' directives and guidance treat UOCAVA voters as
     exempt from 52 U.S.C. § 21083(a)(5)(A)'s voter registration
     information verification requirements....................................................... 11

ARGUMENT ..................................................................................................... 13

I.   The Plaintiffs are likely to prevail on the merits. ..................................... 13

II.    The Plaintiffs will be imminently, irreparably harmed absent court
       action .......................................................................................................... 19

III.   The harm to the Plaintiffs greatly outweighs any inconvenience to
       Defendants if the preliminary injunction is issued. ................................. 20

IV.    Granting preliminary injunctive relief will be in the public interest. .................... 21

# Table of Authorities

Page(s)

## Cases

*Acierno v. New Castle County,*
   40 F.3d 645 (3d Cir. 1994) ....................................................................... 22

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
   570 U.S. 1 (2013) ................................................................................... 17

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon,*
   515 U.S. 687 (1995) ................................................................................ 17

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020) ................................................................................ 18

*California v. ARC America Corp.,*
   490 U.S. 93 (1989) .................................................................................. 16

*Carson v. Simon,*
   978 F.3d 1051 (8th Cir. 2020) ............................................................ passim

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019) ................................................................. 20

*Green Party of Tenn. v. Hargett,*
   767 F.3d 533 (6th Cir. 2014) ................................................................... 21

*Highmark, Inc. v. UPMC Health Plan, Inc.,*
   276 F.3d 160 (3d Cir. 2001) .................................................................... 16

*Issa v. The School District of Lancaster,*
   847 F.3d 121 (3d Cir. 2017) .................................................................... 23

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................................................ 20

*Manuel v. NRA Group LLC,*
   722 Fed. Appx. 141 (3rd Cir. 2018) ........................................................ 20

*McPherson v. Blacker,*
   146 U.S. 1 (1892) ............................................................................................... 24

*Mecinas v. Hobbs,*
   30 F.4th 890 (9th Cir. 2022) ............................................................................ 20

*Nelson v. Warner,*
   12 F.4th 376 (4th Cir. 2021) ............................................................................ 21

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
   514 U.S. 645 (1995) ............................................................................................. 17

*Novartis Consumer Health, Inc. v. Johnson,*
   290 F.3d 578 (3d Cir. 2002) ............................................................................ 23

*Oneok, Inc. v. Learjet, Inc.,*
   575 U.S. 373 (2015) ............................................................................................. 16

*Pavek v. Donald J. Trump for President, Inc.,*
   967 F.3d 905 (8th Cir. 2020) ............................................................................ 21

*Pennsylvania State Conference of NAACP Branches v. Secretary*
*Commonwealth of Pennsylvania,* 97 F.4th 120 (3rd Cir. 2024) ......................................... 18

*Phelps-Roper v. Nixon,*
   545 F.3d 685 (8th Cir. 2008) ............................................................................ 24

*Preston v. Heckler,*
   734 F.2d 1359 (9th Cir. 1984) ............................................................................ 20

*Ramsey v. Nat'l Bd. of Med. Examiners,*
   968 F.3d 251 (3d Cir. 2020) ............................................................................ 16

*Ramsey v. Nat'l Bd. of Med. Examiners,*
   141 S.Ct. 1517 (2021) ......................................................................................... 16

*Republican Party of Pennsylvania v. Degraffenreid,*
   141 S.Ct. 732 (2021) ..................................................................................... 23, 24

*Sebelius v. Cloer,*
   569 U.S. 369 (2013) ............................................................................................. 17

*Shays v. Fed. Election Comm'n,*
   414 F.3d 76 (D.C. Cir. 2005) ............................................................... 20

*U.S. v. Seyed Mohammad Hosein Mousa Kazemi,*
   21 Cr. 644 ................................................................................................. 5

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988) ............................................................................... 18

*Washington Ass'n of Churches v. Reed,*
   492 F.Supp.2d 1264 (W.D. Wash 2006) ............................................... 10

**Statutes**

18 U.S.C. §§ 608–609 ................................................................................ 2

25 Pa.C.S. § 3501 ................................................................................. 12, 13

25 Pa.C.S. § 3502 ..................................................................................... 13

25 Pa.C.S. § 3515 ..................................................................................... 13

39 U.S.C. § 3406 ......................................................................................... 2

52 U.S.C. §§ 20301–20311 ........................................................................ 1

52 U.S.C. § 20302(a)(a)(2) ................................................................passim

52 U.S.C. § 21083(a)(5) ............................................................................. 4

52 U.S.C. § 21083(a)(5)(A) ...............................................................passim

52 U.S.C. § 21083(a)(5)(A)(i-ii) ............................................................. 14

52 U.S.C. § 21083(a)(5)(A)(i-iii) ................................................. 14, 18, 19

52 U.S.C. § 21083(a)(5)(A)(ii)–(iii) ......................................................... 6

52 U.S.C. § 21083(b) .................................................................................. 7

52 U.S.C. § 21083(b)(1) ............................................................................. 8

52 U.S.C. § 21083(b)(2)(i) ......................................................................... 7

Pub. L. 107–252 .......................................................................................... 3

Pub. L. 111-84, §§ 577-83(a) .................................................................. 11

Pub. L. 999-410 .......................................................................................... 1

**Other Authorities**

*Help America Vote Act of 2002-Conference Report: Hearing on
  H.R. 3295 Before the Senate*, 107th Cong. S10488–516 (2002) ........................................ 4

The Plaintiffs who are Congressional candidates seek a restraining order or preliminary injunction to enjoin the Defendants from enforcing laws, directives, or guidance that directly conflict with the Uniformed Overseas Citizen Absentee Voting Act (UOCAVA) and the Help America Vote Act (HAVA) voter registration information verification requirements for Pennsylvania's UOCAVA applicants.

## BACKGROUND

The Plaintiff-Congressional candidates are concerned that Pennsylvania's 2024 final vote tallies will include non-HAVA-verified UOCAVA ballots. According to the U.S. Election Assistance Commission 2020 election report, Pennsylvania received about 27,000 overseas absentee ballots through UOCAVA, with about 20,000 of those ballots coming from non-military applicants.[1]  These non-verified UOCAVA voters could change a close 2024 Congressional election outcome in Pennsylvania.

**A.      Congress enacts UOCAVA in 1986 regulating military and overseas citizens voting.**

In 1986, Congress enacted the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), P.L. 999-410, 52 U.S.C. §§ 20301–20311, 39 U.S.C. § 3406, 18 U.S.C. §§ 608–609. UOCAVA regulates military and overseas citizen absentee voting which is distinct from other state forms of absentee voting. The Federal Post

---

[1]Election Administration and Voting Survey 2020 Comprehensive Report, U.S. Election Assistance Commission, https://www.eac.gov/sites/default/files/document library/files/2020_EAVS_Report_Final_508c.pdf

Card Application (FPCA) is the nationwide form used by members of the U.S. military and their family to request an absentee ballot under UOCAVA. Ex. G.[2] Under UOCAVA, the FPCA can also be used by non-military citizens residing outside of the United States. *Id.* The FPCA includes both a voter registration and absentee ballot combined in a single document. *Id.* HAVA, 52 U.S.C. § 20302(a)(a)(2), mandates states to "accept and process, with respect to any election for Federal office, any otherwise valid voter registration application and absentee ballot application from an absent uniformed services voter or overseas voter, if the application is received by the appropriate State election official not less than 30 days before the election." *Id.* The procedures for registering and voting under UOCAVA apply to "an otherwise eligible voter" meaning that for the UOCAVA privileges to have effect, mandates the individual be an eligible voter under federal and state law. *Id.* The FCPA form includes fields for the HAVA-required driver's license or social security number. *Id.*

## B. Congress enacts HAVA in 2002 requiring voter registration information verification.

In 2002, Congress enacted the Help America Vote Act, Pub. L. 107–252, title III, § 303, Oct. 29, 2002, 116 Stat. 1708 (HAVA), which included, in part, state requirements to verify registration information for all voters, including UOCAVA voters. Specifically, 52 U.S.C. § 21083(a)(5), titled "Verification of voter registration

---

[2] References to exhibits are to the accompanying Nielsen Declaration.

information," established federal mandates for voter registration applicants to provide information, in part "to enable each such [election] official to verify the accuracy of the information provided on applications for voter registration." *Id.* at § 21083(a)(5)(B); *Help America Vote Act of 2002-Conference Report: Hearing on H.R. 3295 Before the Senate*, 107th Cong. S10488–516 (2002). Senator Christopher "Kit" Bond emphasized that the "identification provision and the fraud provisions in this bill are necessary to guarantee the integrity of our public elections and to protect the vote of individual citizens from being devalued by fraud."[3]

Indeed, foreign nations, in efforts to interfere with U.S. elections, could easily submit to a state's election officials falsified FPCAs. *See, e.g.,* https://www.justice.gov/opa/press-release/file/1449226/dl (last visited Sept. 30, 2024) (sealed indictment, *U.S. v. Seyed Mohammad Hosein Mousa Kazemi,* 21 Cr. 644).

Accordingly, HAVA establishes for all states minimum requirements for all applicants registering to vote (including under UOCAVA) to provide information with their application for registration in § 21083(a)(5)(A). Under § 21083(a)(5)(A), a voter registration application may not be accepted or processed by a state unless the application includes the following:

- If an individual has been issued a driver's license, they *must* provide their driver's license number. *Id.* at (a)(5)(A)(i)(I);

---

[3] See https://www.congress.gov/ 107/crec/2002/10/16/CREC-2002-10-16.pdf (last visited: Sep. 24, 20, 2024).

- In the case of an individual who has not been issued a driver's license, the last four digits of the applicant's social security number may be used. *Id.* at (a)(5)(A)(i)(II); or
- If an individual does not possess a driver's license or social security number, the state may assign a unique number, but that individual may not vote in a Federal election unless they provide some other document to establish identity and eligibility. *Id.* at (a)(5)(A)(ii).

R.57. Those qualified to vote who do not have either a driver's license or social security card can still register to vote and be assigned a unique voter identification number by the state, when they prove their identity and eligibility by alternate means. 52 U.S.C. § 21083(a)(5)(A)(ii)–(iii).[4]

Before voting, eligible citizens intending to vote through UOCAVA may register to vote and simultaneously request an absentee ballot using the FPCA. Ex. G. To determine if an applicant is eligible to receive the privileges afforded under UOCAVA, states must first determine if the application is "otherwise valid" as a voter registration application and as an absentee ballot application according to state and federal mandates. 52 U.S.C. § 20302(a)(a)(2).

Additionally, § 21083(b) establishes identification requirements for first-time voters who registered to vote by mail. Section 21083(b)(2)(i) governs an individual who registered to vote by mail but appears to vote in-person. That individual would

---

[4] Examples of other acceptable documents listed in HAVA include a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. *E.g., id.* at § 21083(b)(2)(A)(i)(II).

be required to present another form of identification that "shows the name and address of the voter." *Id.* at (ii)(II).[5] Section 21083(b) also allows for provisional ballots in the absence of the required identification. For first time voters who registered by mail and who choose to vote by mail for the first time, HAVA requires them to include a photocopy of their identification with their mailed ballot.

In HAVA, Congress enumerated an exception for UOCAVA voters who registered by mail and who would be necessarily voting by mail. UOCAVA eligible voters are not required to submit a photocopy of their identification with the ballot when they return the ballot by mail. HAVA's § 21083(b)(1) – requiring a copy of the identification with the ballot --shall not apply in the case of a person who is "entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act." HAVA exempts UOCAVA qualified voters from the (b)(1) requirement to also include a copy of their identification with their ballot, but, HAVA *does not* exempt UOCAVA voters from *ever* providing identification information prior to voting—nor from the general (a)(5) requirements to provide HAVA required identification information when registering to vote.

These distinctions between the general (a)(5) requirements that apply to everyone, and the specific additional requirements under (b)(1), for which UOCAVA-entitled voters are exempted in (b)(3), are reflected in portions of the legislative

---

[5] *See supra,* n. 4.

record, as shared by Senator Christopher Dodd in 2002, who stated, "all new applicants must provide at the time of registration, a valid driver's license number, or if the individual does not have such, the last 4 digits of their Social Security number (or if they have neither, the State shall assign them a unique identifying number)." Congressional Record at S10504.

Importantly, the U.S. Department of Defense, FVAP.gov website, U.S. Department of Justice, the U.S. Election Assistance Commission and a Washington State federal court that collectively confirm that UOCAVA applicants are not exempt from HAVA voter registration information verification.

First, the Federal Voting Assistance Program (FVAP) provides an electronic version of the FPCA. The FVAP website includes instructions for UOCAVA applicants to supply one or more forms of personal identification. R.330 (Screenshot of FVAP.gov web.)

Second, a 2014 U.S. Department of Justice brief filed on behalf of the U.S. Elections Assistance Commission (EAC), states that, "the UOCAVA is a separate statute from the NVRA and contains no language similar to the NVRA's limitation that the Federal Form 'may require only such identifying information ... as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.'" See https://www.justice.gov/sites/default/files/crt/legacy/2014/05/14/kobachmotions. pdf, p. 48 (last visited: Sep. 29, 2024)

Third, the EAC's official guidance on the requirements of HAVA, explains that states should not accept unverified registration applications: "This does not mean that States should accept or add unverified registration applications to the statewide list." [6] The EAC recommends that in the event a state determines that the information provided in a registration application does not match the information contained in a verification database, state officials must contact the individual in order to: (1) inform him or her of the disparity, (2) provide a meaningful opportunity for the applicant to respond or provide the correct information and (3) explain the consequences of failing to reply. *Id.*

Fourth, in 2006, a federal district court in the State of Washington issued a preliminary injunction confirming HAVA requires voter registration information verification. *Washington Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wash 2006). The district court held that the statute was likely to stand as an obstacle to HAVA and the statute was likely to stand as an obstacle to Voting Rights Act. *Id.* at 1264. Afterwards, the court issued a permanent injunctive order, pursuant to stipulation of the parties, requiring, under HAVA, that Washington State not count any ballot from an applicant who has not provided documentation to confirm his or

---

[6]See https://www.eac.gov/sites/default/files/eac_assets/1/1/ Implementing%20Statewide%20 Voter%20Registration%20Lists.pdf. (last visited: Sep. 24, 2024 (emphasis added)).

her identity and eligibility sufficient for the government to complete the verification

process:

> (c) No [provisional] ballot cast pursuant to paragraph (1)(c) above shall be
> tabulated or regarded as containing valid votes for any office or measure until
> the Defendant receives information or the voter presents or submits
> documentation sufficient to register the voter as described in paragraph (1)(a)
> [driver license no. or social security number] or (1)(b) [alternate identification
> information] above.

Ex. K.

Importantly, virtually all other states comply with § 21083(a)(5)(A) and its voter

registration information verification requirements.  The Plaintiffs' complaint provides

detail on five such states: Ohio, Georgia, Alaska, Minnesota, and Washington.  Exs.

H-K; Complaint ¶¶ 125-136.

Subsequently, in 2009, Congress enacted the Military and Overseas Voter

Empowerment (MOVE Act) Pub. L. No. 111-84, §§ 577-83(a), to establish new voter

registration procedures that states must follow for federal elections. But, the MOVE

Act left in place § 21083(a)(5)(A) and its voter registration information verification

requirements for UOCAVA voters.

**C.      Pennsylvania enacts UMOVA in 2012, but it is silent on HAVA's voter
         registration information verification requirements applying to UOCAVA
         voters.**

In 2010, the Uniform Laws Commission (ULC) drafted and promoted a state

model law called the Uniform Military and Overseas Voting Act (UMOVA), 15 states

of which, including Pennsylvania, and the District of Columbia have enacted

8

UMOVA.[7] The ULC's Enactment kit documents, for the first time ever, alleged HAVA's voter registration information verification requirements as an "obstacle" or "challenge" for UOCAVA voters:

- "The obstacles include:…failures to complete absentee voting materials properly, including noncompliance with …verification requirements that can be difficult to meet abroad." Uniform Military and Overseas Voters Act with Prefatory Note and Comments dated July, 2010 at 1.
- "These obstacles include…the inability to comply with…verification procedures…" The Military Coalition Support Letter dated February 23, 2011 at 1.
- "These [challenges] include …the inability to comply with …verification procedures." The Council of State Governments Resolution Supporting the Uniform Military and Overseas Voters Act dated December 6, 2010 at 1.

But, as merely ULC "position statements," they have no bearing on the existing law and application to the UOCAVA verification processing mandates. Indeed, none of the ULC's Enactment kit documents state that UMOVA supersedes HAVA, § 21083(a)(5)(A) and its voter registration information verification requirements, nor could they because of the Supremacy Clause.

In 2012, the Pennsylvania General Assembly enacted its version of UMOVA. 25 Pa.C.S. § 3501, et seq. Pennsylvania's UMOVA extends to all elections (federal, state, and local) with the accommodations and protections for military and overseas

---

[7] See https://www.uniformlaws.org/ committees/communityhome/ librarydocuments? communitykey=6acb3a89-34a9-4df0-a4bc 42f1b35581d8&LibraryFolderKey=& DefaultView= (last visited: Sep. 24, 2024))(ULC's enactment kit including cited documents found here).

voters found in federal law. *Id.* UMOVA ensures compliance with UOCAVA and
MOVE. *Id.* Voters covered under UMOVA include:  (1)  a uniformed-service voter
who is registered to vote in the Commonwealth; (2) an overseas voter (non-military)
who is registered to vote in the Commonwealth; (3) a uniformed-service voter who is
not registered to vote in the Commonwealth but who otherwise satisfies the voter
eligibility requirements of this Commonwealth; and (4) an overseas voter who is not
registered to vote in the Commonwealth but who otherwise satisfies the voter
eligibility requirements of this Commonwealth. 25 Pa.C.S. § 3502. But, Pennsylvania's
UMOVA, 25 Pa.C.S. § 3501, et seq., is silent on UOCAVA's § 21083(a)(5)(A)'s voter
registration information verification requirements.

Even after the enactment of Pennsylvania's UMOVA, 25 Pa.C.S. § 3502
requires overseas non-military applicants to "satisfy the voter eligibility requirements
of the Commonwealth including residency requirements." Further, an overseas
applicant's application can be rejected if an omission prevents an election official
from determining whether the applicant is eligible to register.  25 Pa.C.S. § 3515.
Additionally, unlike some states that allow overseas votes from those who had never
resided in the state to register, Pennsylvania is not a "never-resided" state. This means
that only those citizens who resided in Pennsylvania *before* moving abroad would be
eligible to vote in any election in the state. R.186; *Pennsylvania*, Federal Voting
Assistance Program, https://www.fvap.gov/guide/chapter2/pennsylvania (last visited
Sep. 27, 2024).

**D.    The Defendants' directives and guidance treat UOCAVA voters as exempt from 52 U.S.C. § 21083(a)(5)(A)'s voter registration information verification requirements.**

Since Pennsylvania enacted UMOVA in 2012, the Secretary's and Deputy Secretary's directives and guidance to Pennsylvania counties regarding UOCAVA voters do  not comply with § 21083(a)(5)(A) mandates because UOCAVA voters are treated as exempt from HAVA's voter registration information verification requirements.  As the chief state election official, the Defendants for the State of Pennsylvania are responsible under HAVA to ensure the State, prior to accepting or processing a registration, matches information on a voter registration application with information in the State's motor vehicle authority or with information with the Social Security Administration (or alternate information if such is unavailable):

> [A]n application for voter registration for an election for Federal office **may not be accepted or processed by a State** unless the application includes—
> (I)in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or
> (II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

52 U.S.C. § 21083(a)(5)(A)(i-ii)) (emphasis added). Indeed, HAVA requires the state's chief election official to enter into agreements with the state motor vehicles department and the Commissioner of the Social Security Administration for HAVA verification purposes—which Pennsylvania does. *Id.,* § 21083(a)(5)(B)(i-ii).

But, the Defendants' Directives, in relevant part, requires counties to accept UOCAVA applications and, ultimately count their ballots, without meeting the

requirements of § 21083(a)(5)(A)(i-iii).  Exs. A-F. In 2022, the Department of State's

Voter ID Guidance, stated, "Those entitled to vote by absentee ballot under the

[UOCAVA]… are not required to provide proof of identification." Ex. E. [8]  Deputy

Secretary Marks testified in response to a question regarding the steps that

Pennsylvania takes to verify the information provided on the FPCA used by overseas

non-military UOCAVA voters: "A group of voters [that is, overseas absentee voters]

are specifically exempted from [sic] the HAVA verification requirements… They do

not have to provide PennDoT ID or last 4 of SSN… There's no systematic

verification." Ex. B (House Committee Meetings, *Public Hearing on election administration*

*considerations (in particular in advance of the 2022 General Election)*, at 59:10–1:00:14 (Sept.

14, 2022)). The Secretary's Guidance on Military and Overseas Voters includes the

"Department's position" that UOCAVA applicants are exempt for ID requirements.

Ex. E.

And, despite the contradiction between federal law mandates and the

Secretary's issued directives and guidance, two Pennsylvania administrative complaints

based on Pennsylvania's non-compliance with § 21083(a)(5)(A) have been rejected by

Office of General Counsel. *Wood v. Pennsylvania Department of State*, Docket No. 2022-

04, Report of the Office of General Counsel (Jan. 3, 2023) at 8 (Ex. C); *PA Fair*

---

[8] https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-
elections/directives-and-guidance/2023-Pennsylvania-Military-Overseas-Voters-
Guidance-2.1.pdf.

*Elections v. Pennsylvania Department of State,* Docket No. 2023-001 (appeal pending),

Final Determination (No. 21, 2023) at 7 (Ex. D).  In the Commonwealth Court, the

Department of State persists in its Directives and guidance.  Ex. F.

## ARGUMENT

The Plaintiffs must show that they are likely to prevail on the merits of their

claims, the extent to which the moving party is being irreparably harmed by the

complained-of conduct, the extent to which the non-moving party will suffer

irreparable harm if the preliminary injunction is issued, and whether granting

preliminary injunctive relief will be in the public interest. *Ramsey v. Nat'l Bd. of Med.*

*Examiners,* 968 F.3d 251, 256 (3d Cir. 2020), *cert. denied,* 141 S.Ct. 1517 (2021).

**I.    The Plaintiffs are likely to prevail on the merits.**

As to the first factor, the movant need only prove a "prima facie case," not a

"certainty" of winning. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d

Cir. 2001).  The Plaintiffs have a prima face case of conflict preemption because the

text of § 21083(a)(5)(A) conflicts with Pennsylvania's position that UOCAVA

applicants are exempt from the § 21083(a)(5)(A) voter registration verification

requirements, including residency.

Conflict preemption exists where "compliance with both state and federal law

is impossible," or where "the state law 'stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.'" *California v. ARC*

*America Corp.,* 490 U.S. 93, 100, 101 (1989). When conflict preemption exists, "federal

law must prevail." *Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373, 377 (2015). Here, the Secretary's or Deputy Secretary's directives or guidance to Pennsylvania counties is incompatible with UOCAVA. The directives are *not* harmonious with federal law. While the Elections Clause delegates the authority to prescribe procedural rules for federal elections to the states, the Secretary's or Deputy Secretary's directives do not operate harmoniously with UOCAVA.

Notably, in Elections Clause cases, there is no starting presumption that Congress does not intend to supplant state law, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654 (1995), because the source of congressional power is the Elections Clause and not some other provision of the Constitution. As the Supreme Court has held, "Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 14–15 (2013).

To understand the preemption argument, we begin with, § 21083(a)(5)(A). "As in any statutory construction case," courts must begin "with the statutory text and proceed from the understanding that [u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotation marks and citation omitted) (alterations in the original); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687,

14

697 n.10 (1995) (observing that Congress's choice to "explicitly define[ ]" a statutory term "obviat[es] the need for us to probe its meaning as we must probe the meaning of [ ] undefined [ ] term[s]"). "But, the words of a statute are not read in isolation; statutory construction is a 'holistic endeavor.'" *Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth of Pennsylvania*, 97 F.4th 120, 144–45 (3rd Cir. 2024), quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). "[W]hen the meaning of the statute's terms is plain, [the court's] job is at an end[,]" as "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 673-74 (2020) (citations omitted).

Here, the § 21083(a)(5)(A) meaning is plain. HAVA establishes the state minimum requirements for all applicants registering to vote to provide information with their application for registration in § 21083(a)(5)(A). Under § 21083(a)(5)(A), a voter registration application may not be accepted or processed by a state unless the application includes a driver's license number per (a)(5)(A)(i)(I), a social security number per (a)(5)(A)(i)(II), or alternate identification information, per (a)(5)(A)(ii). *E.g., id.* at § 21083(b)(2)(A)(i)(II); *see also, supra* n.3.This plain meaning reading of § 21083(a)(5)(A) is confirmed by the interpretations of the federal agencies, a federal district court, and other states as previously described.

Conflict preemption applies here because compliance with both the Pennsylvania's position and § 21083(a)(5)(A) is impossible and the Secretary's position

stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting § 21083(a)(5)(A).  The Secretary's or the Deputy Secretary's directives institute policies to ensure UOCAVA applicants are exempt from registration information verification under § 21083(a)(5)(A). The State directives require counties to accept UOCAVA applications and, therefore count their ballots, without meeting the requirements of  § 21083(a)(5)(A)(i-iii). Exs. A-F.  The directives conflict with § 21083(a)(5)(A)(i-iii) which requires all voters, including UOCAVA voters, to satisfy HAVA's voter registration information requirements before there ballot is accepted and counted. For example, the Washington federal court's injunctive order required, under HAVA, that Washington State not count any ballot from a non-registered voter until the government has HAVA-required verification.  Ex. K. The Department's position conflicts with § 21083(a)(5)(A)(i-iii) because it would be impossible to comply with both the Department's position and § 21083(a)(5)(A)(i-iii). The Department's position stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting § 21083(a)(5)(A).

As to standing, the Supreme Court's well-known standing test sets forth an "irreducible constitutional minimum" of three elements that a plaintiff must satisfy: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the

injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court[,]" and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted); *Manuel v. NRA Group LLC*, 722 Fed. Appx. 141, 145 (3ʳᵈ Cir. 2018)

First, the Plaintiffs meet the injury-in-fact requirement. The Congressional candidates have a concrete and particularized interest in ensuring that the final vote tally accurately reflects the legally valid votes cast. The threat of Pennsylvania failing to exclude non-verified UOCAVA applicants is an actual, imminent invasion of the Congressional candidate's legally protected interest. An inaccurate vote tally is a concrete and particularized injury to a federal candidate. *Carson v. Simon*, 978 F.3d 1051, 1058  (8th Cir. 2020). Essentially, if an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would otherwise be if the regulation were declared unlawful, those injured parties have the requisite concrete, non-generalized harm to confer standing. *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9thCir. 2022). Competitive standing recognizes the injury that results from being forced to participate in an "illegally structure[d] competitive environment," *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005), a type of harm that the federal courts have identified in a variety of different contexts, *see, e.g., City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to

17

compete on an even playing field constitutes a concrete and particularized injury."); *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984) ("[W]hen challenged agency conduct allegedly renders a person unable to fairly compete for some benefit, that person has suffered a sufficient 'injury in fact' and has standing ...."). Accordingly, a number of circuit courts have come to the same conclusion that federal candidates and other election participants have competitor standing. *See Carson*, 978 F.3d at 1058; *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (per curiam) (political committees, including the DSCC, had standing to challenge Minnesota's ballot order statute "insofar as it unequally favors supporters of other political parties"); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014) (political parties had standing to challenge ballot order statute because they were "subject to the ballot-ordering rule" and supported candidates "affected by" the law); *see also Nelson v. Warner*, 12 F.4th 376, 384 (4th Cir. 2021) (candidate had standing to challenge ballot order statute that "allegedly injure[d] his chances of being elected").

Second, the factor of "a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court" is met.  In *Carson*, the Eighth Circuit found a causal connection based on a state court's consent decree extending the deadline for counting absentee ballots beyond Election Day:

18

Next, the Electors meet the causal-connection requirement because
the injury flows from the challenged conduct (the Secretary's policy).

*Carson*, 978 F.3d at 1058. Similarly, the Congressional candidates' inaccurate final vote

tally injury flows from the Pennsylvania's challenged Directives and guidance. The

Congressional candidate's inaccurate final vote tally is "fairly traceable" to

Pennsylvania's failure to exclude non-verified UOCAVA applicants.

Third, the favorable court decision will redress the injury because only HAVA-

verified and residency-verified UOCAVA voters will be in the Congressional

candidates' final vote tally making it accurately reflect the legally valid votes cast. A

court injunction enjoining the enforcement of the Secretary's directives and requiring

the HAVA-verification and residency-verification of UOCAVA voters as the status

quo resolves the Congressional candidates' injuries. *See Carson*, 978 F.3d at 1058.

## II.   The Plaintiffs will be imminently, irreparably harmed absent court action.

"[T]o show irreparable harm a plaintiff must demonstrate potential harm which

cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New*

*Castle County*, 40 F.3d 645, 653 (3d Cir. 1994). With the imminent upcoming general

election on November 5, 2024, there is urgency in this motion. There is no remedy

for the Plaintiff-Congressional candidates after the election for the Secretary's

violation of § 21083(a)(5)(A). After the election, the non-verified UOCAVA voters'

absentee ballots have been accepted, co-mingled with other ballots, and counted. So,

without the pre-election injunction, the Plaintiffs suffer irreparable injury as

19

candidates participating in Congressional elections with an illegal election structure

directed by either the Secretary or Deputy Secretary or both. Indeed, a close election

outcome could be changed by these non-verified UOCAVA voters.

### III.     The harm to the Plaintiffs greatly outweighs any inconvenience to Defendants if the preliminary injunction is issued.

The third factor is a balancing of the parties' relative harms—"that is, the

potential injury to the plaintiffs without this injunction versus the potential injury to

the defendant with it in place." *Novartis Consumer Health, Inc. v. Johnson*, 290 F.3d 578,

596 (3d Cir. 2002). The Secretary or Deputy Secretary cannot assert an "interest in

continuing practices through the 2024 election" that violate Congressional candidates'

federal rights as proof of potential harm to Defendants. See *Issa v. The School District of*

*Lancaster*, 847 F.3d 121,143 (3d Cir. 2017). Furthermore, "[t]he precedent that it would

set to allow an executive branch official to negate the duly-enacted election laws of a

state [or of Congress] as they pertain to a presidential [or Congressional] election is

toxic to the concepts of the rule of law and fair elections." *Carson,* 978 F.3d at 1061.

One U.S. Supreme Corut Justice has opined that "[t]here is a reasonable expectation"

that Pennsylvania legislators "will again confront nonlegislative officials altering

elections" based upon the sheer number of unresolved petitions filed to the

Pennsylvania Supreme Court following the 2020 election. See *Republican Party of*

*Pennsylvania v. Degraffenreid*, 141 S.Ct. 732, 737 (2021)(Thomas, J., dissenting).  This

federal court experience indicates adjudicating election official legal violation claims prior to federal elections is best.

## IV.     Granting preliminary injunctive relief will be in the public interest.

The final factor that must be weighed is whether the public interest favors the preliminary injunction. First of all, it should be undeniable that whether the Secretary, as chief election officer, complies with federal election laws is in the public interest, so as not to trample upon a federal candidate's federal rights. *See Carson*, 978 F.3d at 1061, citing *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8thCir. 2008), overruled on other grounds by *Phelps-Rooper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012)(en banc)("[I]t is always in the public interest to protect constitutional rights.") The U.S. Constitution operates as a limitation upon the state with respect to any attempt to circumscribe Congressional power to regulate federal elections. *See McPherson v. Blacker*, 146 U.S. 1, 25 (1892). An election system lacks clear rules when "different officials dispute who has authority to set or change those rules. This kind of dispute brews confusion because voters may not know which rules to follow." *Degraffenreid*, 141 S.Ct. at 734 (Thomas, J.).  As Justice Thomas explained, "[R]ule changes by officials who may lack the authority to do so…can severely damage the electoral system on which our self governance so heavily depends." *Id.* at 735. Accordingly, the public interest in enforcing election laws against Pennsylvania's election officials prior to an election is paramount because, after the election, the Congressional candidates have no remedy against election officials violating election laws.

Dated: October 1, 2024

/s/ Karen DiSalvo
Karen DiSalvo (PA No. 80309)
**Election Research Institute**
Mohrman, Kaardal & Erickson
1451 Quentin Road, Suite 232
Lebanon, PA 17042
kd@election-institute.com
*Attorney for Plaintiffs*

Erick G. Kaardal (WI No. 1035141)*
Elizabeth A. Nielsen (PA No. 335131)*
**Mohrman, Kaardal & Erickson, PA**
150 South Fifth Street, Suite 3100
Minneapolis, MN 55402
kaardal@mklaw.com
nielsen@mklaw.com
*Attorneys for Plaintiffs*
*\*Petitions and Applications for Admission*
*Forthcoming*