**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HON. GUY RESCHENTHALER, a member of the U.S. House of Representatives, HON. DAN MEUSER, a member of the U.S. House of Representatives, HON. GLENN "G.T." THOMPSON, a member of the U.S. House of Representatives, HON. LLOYD SMUCKER, a member of the U.S. House of Representatives, HON. MIKE KELLY, a member of the U.S. House of Representatives, HON. SCOTT PERRY, a member of the U.S. House of Representatives, PA FAIR ELECTIONS, <br><br> Plaintiffs, <br><br> v. <br><br> AL SCHMIDT, in his official capacity as Secretary of the Commonwealth JONATHAN MARKS, in his official capacity as the Deputy Secretary for Elections and Commissions for the Commonwealth of Pennsylvania, <br><br> Defendants, <br><br> and <br><br> DEMOCRATIC NATIONAL COMMITTEE, PENNSYLVANIA DEMOCRATIC PARTY, <br><br> Intervenor-Defendants. | **Case No. 1:24-cv-1671-CCC**<br>**Judge Christopher C. Conner**<br><br><br>**BRIEF OF THE DEMOCRATIC NATIONAL COMMITTEE AND THE PENNSYLVANIA DEMOCRATIC PARTY IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................. 1

QUESTIONS INVOLVED....................................................................... 4

BACKGROUND .................................................................................. 5

LEGAL STANDARDS .......................................................................... 7

ARGUMENT ...................................................................................... 8

I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED............................... 8

    A.    Plaintiffs Lack Article III Standing..................................... 8

    B.    Plaintiffs Lack A Cause Of Action ..................................... 14

    C.    Plaintiffs' Claim Is Barred By Laches And *Purcell* ........................ 15

    D.    The DOS Guidance Does Not Conflict With HAVA ......................... 17

II.   A PRELIMINARY INJUNCTION SHOULD BE DENIED ......................... 26

    A.    Plaintiffs Establish No Likelihood Of Success On The Merits ..........26

    B.    Plaintiffs Demonstrate No Likely Irreparable Harm Absent An Injunction.......................................................................27

    C.    The Balance Of The Equities Does Not Favor Plaintiffs....................27

    D.    A Preliminary Injunction Would Harm The Public Interest..............28

CONCLUSION ....................................................................................30

CERTIFICATE OF SERVICE

ADDENDUM: UNPUBLISHED OPINIONS

i

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Civil Rights Union v. Philadelphia City Commissioners*,
872 F.3d 175 (3d Cir. 2017) ...........................................................14

*Bah v. United States*, 91 F.4th 116 (3d Cir. 2024).....................................7

*Ballentine v. United States*, 486 F.3d 806 (3d Cir. 2007).........................7

*Benisek v. Lamone*, 585 U.S. 155 (2018).................................................28

*Black Political Empowerment Project v. Schmidt*, No. 68 MAP 2024
(Pa. Sept. 13, 2024).........................................................................12

*Bognet v. Secretary Commonwealth of Pennsylvania*, 980 F.3d 336
(3d Cir. 2020).................................................................................11

*Bolus v. Boockvar*, 2020 WL 6880960 (M.D. Pa. Oct. 27, 2020)...........11

*Chapman v. Berks County Board of Elections*, 2022 WL 4100998 (Pa.
Commw. Ct. Aug. 19, 2022) ...........................................................14

*Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016) ...............................15

*Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331
(W.D. Pa. 2020) .............................................................................11

*Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153
(11th Cir. 2008) ..............................................................................20

*Green Party of Tennessee v. Hargett*, 767 F.3d 533 (6th Cir. 2014) .......9

*Issa v. School District of Lancaster*, 847 F.3d 121 (3d Cir. 2017).........27

*Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024)...........................................16

*Lance v. Coffman*, 549 U.S. 437 (2007) ...................................................9

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C.
Cir. 2016)........................................................................................29

*Mecinas v. Hobbs*, 30 F.4th 890 (9th Cir. 2022) ......................................9

*Murthy v. Missouri*, 144 S.Ct. 1972 (2024) .................................................12, 13, 14

*Nelson v. Warner*, 12 F.4th 376 (4th Cir. 2021) ........................................................9

*New Jersey Physicians, Inc. v. President of the United States*, 653
   F.3d 234 (3d. Cir. 2011) ...................................................................10

*Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905 (8th Cir.
   2020) ...................................................................................................9

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984) ...........23, 24

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .........................................................4, 16, 29

*Raines v. Byrd*, 521 U.S. 811 (1997) .....................................................................10

*Republican National Committee v. Democratic National Committee*,
   589 U.S. 423 (2020)..........................................................................30

*Republican Party of Pennsylvania v. Cortés*, 218 F.Supp.3d 396 (E.D.
   Pa. 2016) ...........................................................................................27

*Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th
   Cir. 2004).............................................................................................15

*Santana Products Inc. v. Bobrick Washroom Equipment, Inc.*, 401
   F.3d 123 (3d Cir. 2005) ......................................................................15

*SEC v. Chappell*, 107 F.4th 114 (3d Cir. 2024).................................................26, 27

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ...........................................................9

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ......................................................8, 12

*Voto Latino v. Hirsch*, 712 F.Supp.3d 637 (M.D.N.C. 2024) ................................15

*Washington Association of Churches v. Reed*, 492 F.Supp.2d 1264
   (W.D. Wash. 2006)..............................................................................19

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ..........................................................26, 27

*Ziccarelli v. Allegheny County Board of Elections*, 2021 WL 101683
   (W.D. Pa. Jan. 12, 2021)....................................................................12

# DOCKETED CASES

*Pennsylvania Fair Elections v. Pennsylvania Department of State*, No.
1512 CD 2023 (Pa. Commw. Ct.) ....................................................................11

# STATUTES AND RULES

42 U.S.C. §1983 ...............................................................................................14

52 U.S.C.
§20301(b)(2) ..............................................................................................5
§20301 *et seq*. ..........................................................................................1
§20302(a)(1) ..............................................................................................5
§21083 ......................................................... 5, 6, 17, 18, 19, 20, 24, 25

25 P.S.
§2602(z.5)(3) ........................................................................................7, 25
§2621(f) ..................................................................................................12
§3145.5(a) .................................................................................................1
§3146.2 ...................................................................................................7, 23
§3146.8(i) .........................................................................................7, 12, 25
§3146.5(b)(1) .........................................................................................7, 25
§3150.12b(c) ..........................................................................................7, 25
§3150.15 ................................................................................................7, 25
§3154 .....................................................................................................12, 13

25 Pa.C.S.
§1301(a) .................................................................................................6, 24
§1328 ....................................................................................................7, 23
§3501 .......................................................................................................15
§§3501-3519 ..............................................................................................3

Pennsylvania Act 189 of 2012 ........................................................................3

Federal Rule of Civil Procedure
65(d)(2) ...............................................................................................2, 13
12(b) .........................................................................................................7

Local Rule 7.8(a).............................................................................................4

## OTHER AUTHORITIES

2024-2025 Pennsylvania Voting Assistance Guide (Aug. 2023),
    https://tinyurl.com/5n9yhune......................................................................25

Indictment, *United States v. Kazemi*, 21 Cr. 644 (S.D.N.Y.) (unsealed
    Nov. 18, 2021) ...........................................................................29, 30

Pennsylvania Department of State, *Military And Overseas Voters
    Protocol* (Aug. 2012), https://tinyurl.com/2vyv85jx.....................................15

U.S. EAC, *Voluntary Guidance on Implementation of Statewide Voter
    Registration Lists* (July 2005), https://tinyurl.com/6frzjdcf..........................23

# INTRODUCTION

Plaintiffs seek to disenfranchise tens of thousands of Pennsylvanians serving in the military or residing overseas (or both)—citizens whose voting rights have special protection from Congress under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §20301 *et seq.*  Plaintiffs seek to deny these people their fundamental right to vote, moreover, less than five weeks before the November elections—and more than a month *after* UOCAVA ballots were first sent to voters, *see* 25 P.S. §3145.5(a).  The last-minute nature of plaintiffs' challenge cannot be attributed to the laws and guidance they challenge, since those have been in place for nearly *twelve years*.  Plaintiffs simply chose to sit on their hands for over a decade and then attack the voting rights of those serving in our military only after the 2024 general election was underway.

Specifically, plaintiffs—six Republican members of Pennsylvania's U.S. House delegation and a self-described "election integrity" organization (Am. Compl. ¶35)—ask this Court to enjoin county election officials from canvassing any ballots returned by eligible voters until some verification of those voters occurs or until they provide identification that federal law expressly does not require.  Plaintiffs' claims misstate the law (state and federal), and appear to misunderstand entirely the voter-registration process in the Commonwealth (for UOCAVA and all other qualified voters).  But the Court cannot even reach the merits, because there are multiple

1

threshold defects with the complaint that foreclose plaintiffs' last-minute request to disenfranchise military and other Pennsylvania voters—and that make clear that this lawsuit is really an effort to sow public doubts about the election.

For starters, plaintiffs have not plausibly alleged any element of Article III standing.  For instance, the individual plaintiffs have not alleged any way in which the Election Code's treatment of UOCAVA voters harms their electoral prospects, and the complaint does not identify a single injured member of the organizational plaintiff, which the Third Circuit requires to establish associational standing. Plaintiffs' alleged harm (purportedly inaccurate vote tallies), meanwhile, is neither traceable to a named defendant nor redressable in this action, because the Election Code makes county boards of elections responsible for registering voters and canvassing ballots.  Indeed, plaintiffs cannot obtain an order enjoining the county boards of elections to set aside UOCAVA ballots because an injunction cannot bind these non-parties.  *See* Fed. R. Civ. P. 65(d)(2).

Plaintiffs' also have no cause of action under the Help America Vote Act ("HAVA").  Under well-established Third Circuit precedent, private parties cannot enforce the provisions of HAVA on which they rely.

And their challenge could and hence should have been brought years ago, rather than mere weeks before election day.  Pennsylvania implements UOCAVA through its Uniform Military and Overseas Voters Act ("UMOVA"), 25 Pa.C.S.

§§3501-3519—which the General Assembly enacted in 2012, *see* Pa. Act 189 of 2012. That same year, the Pennsylvania Department of State ("DOS") issued guidance explaining that—as federal law dictates—first-time voters availing themselves of UOCAVA need not enclose a copy of a driver's license, utility bill, or other identification document with their absentee ballot. This 2012 guidance is substantively identical to the guidance from the Secretary of the Commonwealth that plaintiffs now challenge. Plaintiffs offer no explanation for waiting a dozen years to bring this action and then demanding that this Court rush out relief. In short, their claim is barred by both laches and the *Purcell* principle.

If none of these threshold defects existed, then dismissal on the merits would be warranted. HAVA requires state election officials to *collect* voter-registration applicants' driver's-license or social-security numbers (if they have either), and the Defense Department's Federal Post Card Application has blanks for both. But (contrary to plaintiffs' assertion) HAVA leaves it to states to determine whether to condition registration on a successful match of either number to a state or federal database. Pennsylvania law does not permit counties to reject registration applications (for any voter, UOCAVA-protected or not) solely because of a non-match. The Secretary has accordingly advised county boards not to do so just because the database match process failed. That guidance is consistent with state

3

and federal law.  In any event, plaintiffs have presented no evidence that UOCAVA voters are treated any differently from other Pennsylvanians in this regard.

Finally, plaintiffs' request for a preliminary injunction should be denied.  For all the reasons just given, plaintiffs will not likely succeed on the merits.  Their speculation that invalid UOCAVA ballots could change the outcome of an election—supported by no evidence that any such invalid ballots have even been submitted in this election or any other—fails to establish likely and imminent irreparable harm.  The balance of the equities and public interest likewise favor denying extraordinary relief.  Plaintiffs' inexcusably belated request for relief in the middle of an election would create chaos for election administration, confuse voters, and potentially disenfranchise tens of thousands of eligible Pennsylvanians who wear their Nation's uniform or are otherwise living overseas.

The complaint should be dismissed and a preliminary injunction denied.

### QUESTIONS INVOLVED[1]

1.      Whether plaintiffs have Article III standing and a cause of action.

2.      Whether this case is barred by laches or the principle articulated in *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), that federal courts ordinarily should not alter state election law shortly before an election.

---

[1] Because plaintiffs' motion did not state the questions involved, these statements should be "deemed adopted" under Local Rule 7.8(a).

3. Whether plaintiffs can obtain an injunction requiring the 67 county boards of elections to segregate UOCAVA ballots when none is a party to this case.

4. Whether HAVA bars the challenged DOS guidance on UOCAVA.

## BACKGROUND

1. <u>UOCAVA.</u>  UOCAVA requires states to allow U.S. citizens serving in the military or living overseas to vote absentee in federal elections.  52 U.S.C. §20302(a)(1).  Under UOCAVA, the federal government must "prescribe an official post card form, containing both an absentee voter registration application and an absentee ballot application" for state use.  *Id.* §20301(b)(2).  The Defense Department has thus developed the Federal Post Card Application ("FPCA"), which contains blanks for an applicant's driver's-license or social-security number.  *See* Am. Compl. Ex. G.

2. <u>HAVA.</u>  HAVA directs each state to establish a "computerized statewide voter registration list … that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each."  52 U.S.C. §21083(a)(1).  And §21083(a)(5)(A) of HAVA—which governs voter *registration*—requires that "an application for voter registration … not be accepted or processed by a State unless [it] includes (I) … the applicant's driver's license number; or (II) … the last 4 digits of the applicant's social security number."  *Id.* §21083(a)(5)(A)(i).  If an applicant has neither number, "the state shall

assign the applicant a number which will serve to identify the applicant for voter registration purposes." *Id.* §21083(a)(5)(A)(ii).  HAVA also requires state election officials to enter agreements to enable them to "match information" in the computerized statewide voter registration list with data in the state motor-vehicle and Social Security Administration databases. *Id.* §21083(a)(5)(B)(i).

HAVA §21083(b) imposes certain requirements that people who register by mail must meet when they *vote* for the first time—not when they register.  More specifically, section 21083(b) generally requires individuals who had not previously voted in a state and who registered by mail to present, when they vote in person, either "a current and valid photo identification" or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows [her] name and address."  52 U.S.C. §21083(b)(2)(A)(i).  If such individuals instead cast their first ballot by mail, they must submit with their ballot a copy of one of those items. *Id.* §21083(b)(2)(A)(ii).  But HAVA expressly excuses from this requirement people who are "entitled to vote by absentee ballot under" UOCAVA. *Id.* §21083(b)(3)(C)(i).

3.   <u>Pennsylvania Law.</u>  Pennsylvania's Election Code provides four voter-registration requirements, related to age, citizenship, residency, and felony incarceration status.  25 Pa.C.S. §1301(a).  County officials may reject a voter-registration application only if: (1) "[t]he application was not properly completed,"

or "[t]he applicant is" (2) "not a qualified elector," (3) "not entitled to a transfer of registration or a change of address," or (4) "not legally qualified for a change of name." *Id.* §1328(b)(2)(i)-(iv).  Separately, the Election Code requires absentee and mail voters to provide "proof of identification" when they apply for a mail or absentee ballot, 25 P.S. §§3146.2(e.2), 3146.2b(d), 3146.5(b)(1), 3146.8(h)(2), 3150.12b(c), 3150.15, which can include a valid government photo ID or a match of the voter's driver's license number or last four digits of the voter's SSN, *id.* §2602(z.5)(3).   But Pennsylvania law does not impose this requirement on UOCAVA voters.  *Id.* §3146.8(i).

## LEGAL STANDARDS

The DNC and PDP seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Under each rule, the Court "accept[s] as true the facts alleged in the complaint, along with reasonable inferences that can be drawn from those facts." *Bah v. United States*, 91 F.4th 116, 119 (3d Cir. 2024).  Under Rule 12(b)(1), "the plaintiff bears the burden of establishing … standing." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  Rule 12(b)(6) requires a complaint to be dismissed unless it states a "claim [that] has facial plausibility." *Bah*, 91 F.4th at 119.

## ARGUMENT

### I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED

#### A.   Plaintiffs Lack Article III Standing

To avoid dismissal for lack of standing, "plaintiff[s] must clearly allege facts demonstrating each element," i.e., that plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Plaintiffs fail to adequately allege *any* of these elements.

1.   <u>Injury In Fact.</u>  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quotation marks omitted).  "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (quotation marks omitted). Here, neither the individual plaintiffs nor PA Fair Elections ("PFE") plausibly alleges adequate injury.

a.   The individual plaintiffs invoke (Mot.17) the doctrine of "[c]ompetitive standing."  But complaint does not plausibly allege standing on that basis.  The individual plaintiffs assert that, as "candidates … in the upcoming … election," they "gain or lose by the[ir] forced participation … in the illegal election structure regarding absentee voters and the tally of those votes," which they allege "may not accurately reflect the legally valid votes cast.  Am. Compl. ¶¶179-183; Mot.17.  But

plaintiffs nowhere allege or argue that this "allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party than it would … if the regulation were declared unlawful." *Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022).  Plaintiffs, that is, allege no facts from which to infer that the purported risk of an "inaccurate vote tally" in their races (Am. Compl. ¶184) "unequally favors … other" candidates, *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (per curiam); "allegedly injur[es] [their] chances of being elected," *Nelson v. Warner*, 12 F.4th 376, 384 (4th Cir. 2021); or unlawfully "discriminates against [them] by conferring an advantage on" their opponents, *Green Party of Tennessee v. Hargett*, 767 F.3d 533, 540 (6th Cir. 2014). Nor do the complaint's allegations support an inference that plaintiffs "face *intensified* competition" or "additional *rivals*," or that the Directive requires them to "seek[] reelection through contests" in which "opponents will use … []proscribed campaign practices" "against them" in a manner that "fundamentally alter[s] the environment in which rival parties defend their concrete interests," *Shays v. FEC*, 414 F.3d 76, 85-86 (D.C. Cir. 2005).  Rather, "[t]he only injury plaintiffs allege is that the law … has not been followed," which "is precisely the kind of undifferentiated, generalized grievance" that the Supreme Court has "refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

It is also irrelevant that individual plaintiffs are current House members who allegedly "would vote no … on a federal bill to exempt Pennsylvania from complying with … UOCAVA and HAVA."  Am. Compl. ¶¶34, 45-50.  Members of Congress cannot establish Article III standing by asserting "a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally."  *Raines v. Byrd*, 521 U.S. 811, 821 (1997).  In particular, assertions by "Members of Congress" that they would "vote[] 'nay,'" on a piece of legislation does not establish an "alleged … injury to themselves as individuals," because "the institutional injury they allege is wholly abstract and widely dispersed."  *Id.* at 814, 829.

b.     Plaintiffs do not plausibly allege that PFE has suffered injury in fact, either directly or via its members.  PFE claims (Am. Compl. ¶35) to be "an association of Pennsylvania voters," including "UOCAVA voters."  But "to establish associational standing …, an organization must make specific allegations … that at least one identified member has suffered or would suffer harm."  *N.J. Physicians, Inc. v. President of the United States*, 653 F.3d 234, 241 (3d. Cir. 2011) (quotation marks omitted).  The complaint's failure to identify any such member precludes

associational standing.  And the complaint contains no allegations from which to infer that PFE is directly injured as required to establish organizational standing.[2]

Even if a specific member were identified, the complaint still would not plausibly allege injury to PFE.  The only relevant allegation (¶185) is that PFE's UOCAVA voter-members "are injured by Defendants' directives and guidance invalidating their and others' UOCAVA votes by failing to verify voter registration information prior to counting UOCAVA ballots."  This appears to be a claim of "vote dilution" from the counting of supposedly improper UOCAVA ballots, that would be legally inadequate.  "Voter[s] … lack standing to redress their alleged vote dilution" based on "state actors counting ballots in violation of state … law" "because that alleged injury is not concrete…, nor is it particularized."  *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 352-354 (3d Cir. 2020), *vacated as moot*, 141 S.Ct. 2508 (2021); *see also Bolus v. Boockvar*, 2020 WL 6880960, at *3 (M.D. Pa. Oct. 27, 2020).  Moreover, these alleged vote-dilution injuries are "speculative, and thus … not 'concrete.'"  *Donald J. Trump for President, Inc. v. Boockvar*, 493 F.Supp.3d 331, 342 (W.D. Pa. 2020).

---

[2] PFE previously filed a complaint with DOS alleging HAVA violations.  D-E 6-4, at 1.  DOS dismissed the complaint as meritless.  *Id.* at 11.  The appeal from that dismissal is set for oral argument in the en banc Commonwealth Court on November 6.  *Pa. Fair Elections v. Pa. Dep't of State*, No. 1512 CD 2023 (Pa. Commw. Ct.).

2.   <u>Traceability To Defendants' Conduct.</u>   Plaintiffs' alleged injuries are not "fairly traceable to the challenged conduct of the defendant," *Spokeo*, 578 U.S. at 338.   Plaintiffs allege they will be harmed by supposedly "inaccurate vote tall[ies]."   Am. Compl. ¶184.   But votes are tallied by Pennsylvania's 67 county boards of elections.   *See* 25 P.S. §§3146.8, 3154.   The Secretary's role is "to receive" such tallies "from county boards of elections."   *Id.* §2621(f).   Seemingly recognizing this, plaintiffs style their claim as challenging the Secretary's *guidance* for the boards' respective implementation of UOCAVA and UMOVA.   Am. Compl. ¶9. But, at least as relevant here, "under Pennsylvania law, the Secretary's pre-election guidance is just that—guidance.   County boards of elections ultimately determine what ballots to count" under the state Election Code, subject to judicial review. *Ziccarelli v. Allegheny Cnty. Bd. of Elections*, 2021 WL 101683, at *5 n.6 (W.D. Pa. Jan. 12, 2021).   Indeed, the Pennsylvania Supreme Court recently dismissed a case against the Secretary because his role in issuing guidance was insufficient to establish jurisdiction under state law.   *See* Order, *Black Pol. Empowerment Project v. Schmidt*, No. 68 MAP 2024 (Sept. 13, 2024).   Whether plaintiffs' supposed injury flows from the way the boards have processed UOCAVA registrations in the past or how they expect boards to do so in the future, plaintiffs "rely on a speculative chain of possibilities to establish a likelihood of future harm traceable to" a defendant, *Murthy v. Missouri*, 144 S.Ct. 1972, 1993 (2024)

(quotation marks omitted).   Plaintiffs simply assert that "[t]here is a causal connection between the challenged conduct of [defendants'] … policy and guidance and the asserted injury."  Am. Compl. ¶188; *accord* Mot.19 (same).  Speculation about a party's indirect influence on an independent actor does not establish traceability.  *Murthy*, 144 S.Ct. at 1993.

3.   Redressability.  Finally, plaintiffs' alleged injury is not "redressable by a favorable ruling" entered against either defendant, *Murthy*, 144 S.Ct. at 1986.  To determine redressability, "[courts] consider the relationship between the judicial relief requested and the injury suffered."  *Id.* at 1995 (quotation marks omitted).

As noted, plaintiffs allege they are harmed by "inaccurate vote tall[ies]" (Am. Compl. ¶184), and they seek an "injunction requiring *county election officials* to segregate UOCAVA ballots," *id.* at 42 (emphasis added).  But the county boards "are not parties to the suit, and there is no reason they should be obliged to honor" an order granting plaintiffs' requested relief, *Murthy*, 144 S.Ct. at 1995 (quotation marks omitted).  Indeed, an injunction "binds only … the parties[,] the[ir] … agents[,] and other persons who are in active concert or participation with" the parties.  Fed. R. Civ. P. 65(d)(2).  The boards do not qualify.

Plaintiffs never even allege that (or explain how) any relief sought against either defendant would redress their supposed injuries.  County boards carry out the counting process, not the Secretary.  25 P.S. §3154(a).  Moreover, in this context,

"the Secretary does not have the authority to direct the [b]oards to comply with" a court order.  *Chapman v. Berks Cnty. Bd. of Elections*, 2022 WL 4100998, at \*10 (Pa. Commw. Ct. Aug. 19, 2022).  This state-law allocation of authority is decisive: "[I]t is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court," particularly where "independent decisionmakers will exercise their judgment" in response to an order entered against a party.  *Murthy*, 144 S.Ct. at 1986 (quotations omitted).

Plaintiffs' failure to plausibly allege all (or indeed any) of the elements of Article III standing requires dismissal.

### B.    Plaintiffs Lack A Cause Of Action

Even if any plaintiff had standing, the complaint would have to be dismissed because plaintiffs lack a cause of action.  Indeed, plaintiffs' single claim (Am. Compl. ¶¶173-201) does not specify a cause of action.  They certainly cannot bring a claim under HAVA, because for these provisions, "HAVA does not include a private right of enforcement," *Am. Civil Rights Union v. Phila. City Comm'rs.*, 872 F.3d 175, 184 (3d Cir. 2017).[3]

---

[3] Where courts have held provisions of HAVA privately enforceable, they have done so not by an implied right of action but under 42 U.S.C. §1983, in a much different context.  Those actions have been brought by or on behalf of voters whom the state threatens to *deprive* of individual rights protected by HAVA, such as the entitlement

### C.    Plaintiffs' Claim Is Barred By Laches And *Purcell*

The equitable defense of laches requires dismissal of an action if (1) a plaintiff has inexcusably delayed in bringing a suit, and (2) the delay prejudices the defendant. *Santana Products Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). Both elements are met here.

First, this case challenges (1) UMOVA, which took effect in 2012 (*see* 25 Pa. C.S. §3501, Credits), and (2) DOS guidance originally issued that same year, *see* Pennsylvania Department of State, *Military And Overseas Voters Protocol* (Aug. 2012), https://tinyurl.com/2vyv85jx. Plaintiffs admit these are their targets, stating (Am. Compl. ¶196) that "[i]f the … directives and guidance are based on the Defendants' position on or interpretation of state statutes, such as [UMOVA], then those state statutes, to the extent they conflict with … federal requirements …[,] are preempted." There is no justification for plaintiffs having waited about *twelve years* before suing—then filing this action weeks before the election and after ballots have been sent to UOCAVA voters.

Second, plaintiffs' delay severely prejudices the DNC and PDP, by threatening the exclusion of ballots cast by military or overseas voters who support

_____

not to be arbitrarily removed from voter rolls, *see Colón-Marrero v. Vélez*, 813 F.3d 1, 22 (1st Cir. 2016), or "the right to cast a provisional ballot," *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (per curiam); *see also Voto Latino v. Hirsch*, 712 F.Supp.3d 637, 663 (M.D.N.C. 2024) (listing cases). Section 1983 is inapplicable here, as plaintiffs seek to *deny* voting rights.

Democratic candidates.  In casting their ballots, those eligible Pennsylvania voters have reasonably relied or will reasonably rely on UMOVA's protections—again, because those protections have been in place for well over a decade now, unchallenged by plaintiffs.  If these voters' ballots are discarded, the DNC and PDP will be prejudiced in their ability to succeed in their mission of having Democratic candidates elected.  For the same reason, plaintiffs' requested relief would prejudice candidates who are members of or supported by the DNC and PDP.  Setting aside UOCAVA ballots could also delay post-election counting processes, possibly imperiling timely completion of those processes, including certification of the results, *see* 25 P.S. §2642(k).  This too would prejudice the DNC and PDP.

Finally, this Court must weigh "considerations specific to election cases" when evaluating plaintiffs' delay.  *Purcell*, 549 U.S. at 4.  The relief plaintiffs request would "lead to voter confusion," *Kim v. Hanlon*, 99 F.4th 140, 160 (3d Cir. 2024).  Military and overseas voters who have come to rely on UMOVA's processes and who may have already returned their completed ballots for the upcoming election (ballots, as noted, had to be sent out weeks ago) would be left questioning what they need to do to ensure their votes are counted.  And election officials would be forced to depart from a decade-old practice—one that has long kept Pennsylvania's elections safe and secure—and try to solicit information from voters who by definition cannot come to their county board to resolve issues.  In short, *Purcell*

confirms that this Court should deny plaintiffs' belated attempt to cast doubt on the integrity of the upcoming election.

### D.     The DOS Guidance Does Not Conflict With HAVA

If the Court could reach the merits, plaintiffs' claims would fail.  Plaintiffs contend that DOS directives, guidance, and statements concerning UOCAVA voters conflict with HAVA, specifically 52 U.S.C. §21083(a)(5)(A), which requires voter-registration applicants to provide driver's-license or social-security numbers on their applications if they have such numbers.  There is no conflict.

1.     Plaintiffs argue that HAVA requires a state to verify a "match" between an identification number given by a voter-registration applicant and data in the state motor-vehicle database or a profile from the Commissioner of Social Security before registering the applicant.  Am. Compl. ¶124; Mot.11.  That is wrong.  HAVA requires an applicant to *provide* an identification number—if she has it—on her application.  52 U.S.C. §21083(a)(5)(A).  But it does not require a state to *verify* that a person's number matches data in other databases before registering the person.

HAVA directs each state to maintain a single "computerized statewide voter registration list," with a "unique identifier" assigned to each registered voter in the state.  52 U.S.C. §21083(a)(1)(A).  It also requires an applicant to provide a driver's-license or social-security number on her application, if she has one.  *Id.* §21083(a)(5)(A)(i).  For applicants who have neither, the state must assign a unique

identifier for the statewide computerized list.  *Id.* §21083(a)(5)(A)(ii).  And HAVA requires each state's chief election official to "enter into an agreement" with the state's top motor-vehicle official "to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority," "to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration."  *Id.* §21083(a)(5)(B).  In turn, the motor-vehicle official must enter an agreement with the Commissioner of Social Security.  *Id.*

Nothing in HAVA, however, requires states to confirm a match before processing a voter's application.  The law simply requires that—as an administrative matter—state officials enter into agreements that would "enable" them to check the accuracy of information provided on applications for voter registration, without conditioning registration on verification.  Nor would such a condition make sense, given that HAVA contemplates some applicants will have neither a driver's-license nor a social-security number.  Such applicants have no number that could be "matched" before registering them.  Congress could not have intended to require matching before registration knowing that certain applicants would have no identifying number to match against.

Moreover, HAVA contemplates instances in which a person will be registered to vote even though the driver's-license or social-security number provided on her

registration application is *not* matched against information in the state motor-vehicle database or from the Commissioner of Social Security.  Section 21083(b) provides that voters who register to vote by mail must provide proof of identity—like photo identification or a copy of a current utility bill—when they vote for the first time. 52 U.S.C. §21083(b)(2)(A).  But these requirements do not apply if the voter (1) provided a driver's-license or social-security number when they registered to vote and (2) a state or local official matched the information with information in one of the comparison databases.  *Id.* §21083(b)(3)(B).  In other words, if a state or local official has already matched a voter's identification information, then the voter need not present proof of identity when voting for the first time.  This means HAVA necessarily contemplates instances in which a state registers a voter but does *not* verify a match before the voter submits a ballot, because HAVA directs these voters to present proof of identity the first time they vote.  (As discussed below, *see* pp.23-26, HAVA exempts UOCAVA voters from having to provide proof of identity the first time they vote, regardless of whether their driver's license or Social Security number has been matched.  *Id.* §21083(b)(3)(C)(i).)

The two most on-point cases recognize this, each holding that HAVA does not *require* matching as a prerequisite to registration.  In *Washington Association of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wash. 2006), the plaintiffs challenged a state's matching statute, one that (unlike Pennsylvania's Election Code),

"essentially require[d] the state to match a potential voter's name to either the Social Security Administration … database or to the Department of Licensing … database before allowing that person to register to vote," *id.* at 1266.  The court deemed it "clear … that HAVA's matching requirement was intended as an administrative safeguard for storing and managing the official list of registered voters, and not as a restriction on voter eligibility." *Id.* at 1268-1269 (quotation marks omitted).

The court in *Florida State Conference of the NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), likewise considered a state statute requiring a verified match as a precondition of registering to vote, *id.* at 1155.  The court acknowledged that HAVA does not require matching as a precondition, *see id.* at 1172, but reasoned that the statute "also does not seem to prohibit states from implementing it," *id.* at 1168.  In other words, the court (like *Reed*) agreed that HAVA does not require matching as a prerequisite to voter registration.

Plaintiffs suggest (Mot.15) that their contrary interpretation of HAVA follows from the "plain … reading of § 21083(a)(5)(A)."  That plain reading, they say, is that "a voter registration application may not be accepted or processed by a state unless the application includes a driver's license number per (a)(5)(A)(i)(I), a social security number per (a)(5)(A)(i)(II), or …, per (a)(5)(A)(ii)," the unique identifier that states must assign to applicants without a driver's license or Social Security number. Mot.15. But this "plain … reading," *id.*, confirms that HAVA only requires

(a) an applicant to *provide* a driver's-license or social-security number (if she has it), and (b) a state to provide a unique identifier to an applicant who has neither number. Nothing in that language requires a state to confirm a match with any database before processing a registration application.

Nor is plaintiffs' claim salvaged by their statement that "[t]hose qualified to vote who do not have either a driver's license or social security card can still register to vote and be assigned a unique voter identification number by the state, when they prove their identity and eligibility by alternate means" like "a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter." Mot.4 & n.4. This conflates HAVA's requirements in §21083(a)(5) for voter *registration* with the law's requirements in §21083(b) for those who registered by mail to *vote* for the first time. HAVA's general requirement that voters who registered by mail present proof of identity the first time they *vote* has no bearing on whether HAVA requires applicants to present proof of identity when *registering*. Moreover, nothing in HAVA requires applicants in general to present such documents with a registration application, and HAVA exempts UOCAVA voters from presenting such documents with their first ballots.

Plaintiffs cite two other sources that they say support their interpretation of HAVA, but neither does. *First*, plaintiffs rely (Am. Compl. ¶124; Mot.7) on *Reed*. But as discussed, that case *rejects* their argument that HAVA requires a verified

match before registration.  Seemingly recognizing this, plaintiffs attach, as Exhibit K to the amended complaint, a later order in *Reed* issuing a stipulated injunction (Mot.7).  Consistent with the court's earlier ruling, that order permanently enjoined the state from rejecting voter registration applications based solely on a non-match.  Am. Compl., Ex. K at 2.  Again conflating HAVA's separate registration and voting requirements, plaintiffs quote part of the stipulated order that concerns the parties' agreement about requirements to *vote*, not register.  *See id.* at 3-4; Mot.7-8 (quoting the order's discussion of requirements for counting provisional "ballot[s]").

*Second*, plaintiffs cite guidance from the U.S. Election Assistance Commission (Am. Compl. ¶163; Mot.7).  That guidance "is voluntary.  This means that States can choose to adopt this guidance to assist in the implementation of HAVA's requirements for a statewide voter registration list or create their own policies."  U.S. EAC, *Voluntary Guidance on Implementation of Statewide Voter Registration Lists* at 2 (July 2005), https://tinyurl.com/6frzjdcf.  In any event, the guidance does not say that states must verify a match before registering a voter.  *Id.*

Put simply, HAVA does not require a verified match between the information provided on a voter-registration application and data in any comparison database before a state may process the application and register the applicant.

    2.    None of the guidance or statements by state officials about UOCAVA voters that plaintiffs point to conflicts with the proper construction of HAVA.

*First*, plaintiffs challenge DOS's Directive Concerning HAVA-Matching Drivers' Licenses or Social Security Numbers for Voter Registration Applications (Am. Compl. Ex. A ("Directive")), which informs county boards that under state and federal law, voter-registration applications "may *not* be rejected based solely on a non-match between the applicant's identifying numbers on their application and the comparison database numbers."  The Directive (which does not distinguish between UOCAVA and non-UOCAVA voters) thus correctly reflects that HAVA does not require a match as a prerequisite to voter registration. *See id.* at 1.  It also correctly explains that—under state law—a county board may not reject a voter-registration application based solely on a non-match.  *Id.*; *see* 25 Pa. C.S. §§1328(b)(2)(i)-(iv) (grounds to reject application), 1301(a) (voting qualifications).

*Second*, plaintiffs point (Am. Compl. ¶¶13, 131, 171) to a Q&A in DOS's Pennsylvania Military and Overseas Voters Guidance (Am. Compl. Ex. E ("Guidance")).  The relevant part of that Q&A (which plaintiffs' motion misquotes (p.12)) states:  "What are the voter ID requirements for covered voters?  The Department's position is that covered voters are exempt from the Election Code's ID requirements for absentee voters." *Id.* at 8.  As an initial matter, it is unclear how this statement about what *state* law requires bears on whether the statement indicates a conflict with *federal* law.  Federal courts cannot compel compliance by state officials with state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S.

89, 124-125 (1984).  The same is true of plaintiffs' mentions of Pennsylvania's residency requirement.  *E.g.*, Am. Compl. ¶¶6, 119, 168.  Indeed, plaintiffs' request for an injunction ordering defendants to "comply with … state law … including state residency requirements," *id.* at 42, is plainly barred by *Pennhurst*.

*Third*, plaintiffs cite (Am. Compl. ¶109; Mot.22) a statement by one defendant during a General Assembly hearing, Am. Compl. Ex. B at 59:10:00-1:00:14:

> <u>Rep. Francis X. Ryan</u>:  But one final question.  The UOCAVA system.  There's been a significant increase in the number of non-military ballots that came out through the system.  What steps are taken to verify, by county election offices, to verify the information on the Federal Post Card Applications received from overseas non-military voters or is there any requirement to have verification done?

> <u>Deputy Secretary Marks</u>:  Those voters … are specifically exempted from the HAVA verification requirements.  So they do not have to provide the PennDOT ID or last four of SSN.  That's an exemption both in federal law and I believe state law as well.  So there is no systematic verification if that's what you're asking.

The question initially addressed UOCAVA *ballots*, but then shifted confusingly to UOCAVA *registration* applications.  The best interpretation of the answer is that it sought to convey that both HAVA and state law exempt UOCAVA voters from having to present proof of identity when returning an absentee ballot for the first time.  And with respect to the part of the question about the FPCA, the Pennsylvania-specific instructions for the FPCA mirror the requirement in HAVA §21083(a)(5): "You must provide your Pennsylvania-issued ID number or the last four digits of your Social Security Number.  If you do not have [either,] you must enter in Section

6: 'I do not have a Social Security Number or Pennsylvania-issued ID number.'"
2024-2025 Pennsylvania Voting Assistance Guide (Aug. 2023),
https://tinyurl.com/5n9yhune.  Even assuming an oral statement (in response to a
truly muddled question) could form the basis for a preemption claim, nothing about
this testimony provides such a basis.[4]

Identifying no conflict between HAVA and any guidance or statement by any
Pennsylvania agency or official, plaintiffs are left to assert repeatedly that
Pennsylvania has issued "directives to county election officials to not attempt to
verify the identity or eligibility of UOCAVA applicants." Am. Compl. ¶43; *see also,
e.g.*, *id.* ¶¶21, 122, 132, 139, 185, 187, 192.  That assertion is baseless.  If plaintiffs
mean to refer to the Directive, it does *not* prohibit counties from attempting to verify
the identity of any applicant.  It explains—consistent with federal and state law—
that a county cannot refuse to process a voter-registration application based solely
on a non-match.  Plaintiffs' bare allegation that the state is directing counties not to
verify UOCAVA applicants' identities does not plausibly state a preemption claim.

Because plaintiffs' claim fails on the merits, dismissal would be warranted
even if none of the myriad threshold shortcomings discussed earlier existed.

---

[4] Plaintiffs also attach to the complaint (Exs. C, D) reports and decisions in
Pennsylvania administrative proceedings rejecting arguments similar to plaintiffs'
here, and the DOS brief (Ex. F) in an appeal to the Commonwealth Court from one
such proceeding.  Those documents each reflect the correct interpretation of HAVA
and its application to UOCAVA voters discussed in the text.

## II.   A Preliminary Injunction Should Be Denied

"Preliminary injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances." *SEC v. Chappell*, 107 F.4th 114, 126 (3d Cir. 2024). A party "seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs do not make a sufficient showing on *any* factor.[5]

### A.   Plaintiffs Establish No Likelihood Of Success On The Merits

For the reasons given above, plaintiffs have no likelihood of success on the merits of their preemption claim. It is worth reiterating that Federal Rule of Civil Procedure 65 precludes the injunctive relief plaintiffs seek. Plaintiffs ask this Court to order "county election officials to segregate UOCAVA ballots." Am. Compl. at 42; *see also* Mot.19 (asserting irreparable harm because, absent a "pre-election injunction," "non-verified UOCAVA voters' absentee ballots [will be] accepted, co-mingled with other ballots, and counted"). But plaintiffs sued no county or county official. Having sued the wrong parties, plaintiffs cannot obtain their desired relief.

---

[5] Plaintiffs cite a pre-*Winter* case in asserting (Mot.13) that for the first factor, they "need only prove a 'prima facie case.'" Again, under *Winter*, they must show they are "likely to succeed," 555 U.S. at 20. Any contrary pre-*Winter* case is abrogated.

### B.     Plaintiffs Demonstrate No Likely Irreparable Harm Absent An Injunction

Plaintiffs assert they will be irreparably harmed because, absent an injunction, they will be forced to "participat[e] in Congressional elections with an illegal election structure" and because "a close election outcome could be changed by these non-verified UOCAVA voters." Mot.20. These allegations are not even sufficient to establish injury for purposes of Article III standing. *See supra* §I.A. They certainly do not justify the extraordinary remedy of a preliminary injunction. That is because a risk of harm is not enough; a plaintiff "must prove irreparable harm is 'likely' in the absence of relief. *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) (quoting *Winter*, 555 U.S. at 22). A "highly speculative concern" that "denying an injunction 'could have a determinative effect on the election'"—like plaintiffs' purported concern here—is "insufficient" to satisfy this requirement. *Republican Party of Pa. v. Cortés*, 218 F.Supp.3d 396, 410 (E.D. Pa. 2016). Plaintiffs also fail to present a shred of evidence that even one fraudulent UOCAVA ballot has been or will be submitted.

### C.     The Balance Of The Equities Does Not Favor Plaintiffs

Because plaintiffs fail to show a likelihood of success on the merits or irreparable injury, the Court need go no further. *See SEC*, 107 F.4th 114, 126. But plaintiffs also cannot show that the balance of the equities favors granting relief.

As discussed, *see supra* §I.C, plaintiffs have no excuse for filing this suit just five weeks before election day—after UOCAVA ballots already have been sent out and an untold number have been returned—when the practices they challenge are over a decade old. "A party requesting a preliminary injunction must generally show reasonable diligence … in election law cases as elsewhere." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Hence, "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weigh[s] against their request." *Id.* at 160.

The equitable scales also tip against granting relief because the requested injunction would harm the DNC and PDP. Each devotes substantial time and resources to supporting their candidate-members' elections, running get-out-the-vote efforts, and engaging in voter education and protection. For over a decade these efforts have relied upon the Commonwealth's consistent implementation of HAVA, UOCAVA, and UMOVA. Plaintiffs' requested injunction would force both the DNC and PDP to divert scarce resources, immediately before and after the election, toward ensuring that their overseas voter-members' ballots are counted.

### D.    A Preliminary Injunction Would Harm The Public Interest

Plaintiffs' public-interest discussion (Mot.21-22) is devoid of any true public-interest considerations; it just rehashes incorrect assertions that the individual plaintiffs' federal rights will be violated absent an injunction and that after the election, they would have no remedy. Plaintiffs likely have little to say about the

public interest because that interest would be severely harmed by the requested injunction. The public has a "strong interest in exercising the fundamental political right to vote." *Purcell*, 549 U.S. at 4 (quotation marks omitted). "[T]he public interest therefore favors permitting as many qualified voters to vote as possible." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (collecting cases). Plaintiffs' vague requested relief—which glosses over the major question of how tens of thousands of voters abroad would "verif[y]" their "identity and eligibility" to plaintiffs' satisfaction in time to have their votes counted and to ensure prompt certification of election results—threatens to disenfranchise thousands of military and overseas voters, contrary to the public interest.

Plaintiffs' suggestions that their requested relief would advance the public interest by reducing the risk of foreign influence in the upcoming elections are meritless. Plaintiffs cite an indictment against Iranian nationals as evidence that "[f]oreign nations … could easily submit falsified FPCAs for ballots to unduly influence U.S. elections." Am. Compl. ¶ 19. The indictment itself refutes that claim. It explains that members of the conspiracy disseminated a "simulated" video that "purported to depict" a hacker "creat[ing] fraudulent absentee ballots through the Federal Voting Assistance Program ("FVAP")." Indictment 3-4, *United States v. Kazemi*, 21 Cr. 644 (S.D.N.Y.) (unsealed Nov. 18, 2021). But it underscores that "the FVAP could *not* be leveraged in the manner implied by the … [v]ideo." *Id.* at

4 (emphasis added).  Plaintiffs thus cite *disinformation* as the basis for their assertion (Am. Compl. ¶19) that foreign nationals "could easily submit falsified FPCAs."  The Justice Department makes crystal clear that the FVAP cannot be so leveraged.  This Court should not credit such fearmongering and casual disregard of facts, and it certainly should not credit debunked propaganda as actual public-interest evidence.

Finally, under the *Purcell* doctrine, federal courts "should ordinarily not alter the election rules on the eve of an election."  *Republican National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam).  This case is exactly what *Purcell* should prevent, *supra* §I.C, as the requested relief would confuse UOCAVA voters and leave election officials scrambling to implement a regime different than the one in place for over a decade.

## CONCLUSION

Plaintiffs' complaint should be dismissed with prejudice.  Whether or not the complaint is dismissed, plaintiffs' preliminary-injunction motion should be denied.

October 11, 2024

Respectfully submitted,

*/s/ Clifford B. Levine*

Clifford B. Levine
   Pa. Id. No. 33507
David F. Russey
   Pa. Id. No. 84184
**DENTONS COHEN & GRIGSBY
  P.C.**
625 Liberty Ave.
Pittsburgh, PA 15222
(412) 297-4900
clifford.levine@dentons.com

Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
Ann E. Himes*
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
2100 Pennsylvania Ave. N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
annie.himes@wilmerhale.com

Nicholas Werle*
Schuyler D. Atkins*
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
nick.werle@wilmerhale.com
schuyler.atkins@wilmerhale.com

Kyle T. Edwards*
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
One Front Street, Suite 3500
San Francisco, CA 94111
(628) 235-1061
kyle.edwards@wilmerhale.com

*Pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was served on all counsel of record on October 11, 2024 by this Court's CM/ECF system.

/s/ *Clifford B. Levine*
CLIFFORD B. LEVINE

## ADDENDUM: UNPUBLISHED OPINIONS

TAB

*Black Political Empowerment Project v. Schmidt*, No. 68 MAP 2024
(Pa. Sept. 13, 2024)............................................................................1

*Bolus v. Boockvar*, 2020 WL 6880960 (M.D. Pa. Oct. 27, 2020)............................2

*Chapman v. Berks County Board of Elections*, 2022 WL 4100998
(Pa. Commw. Ct. Aug. 19, 2022)......................................................3

*Ziccarelli v. Allegheny County Board of Elections*, 2021 WL 101683
(W.D. Pa. Jan. 12, 2021)....................................................................4