# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Hon. Guy Reschenthaler, *et al*.,

        Plaintiffs,

    v.

Secretary Al Schmidt, *et al*.,

        Defendants.

Civil Action No. 1:24-cv-1671-CCC
Hon. Christopher C. Conner

## BRIEF OF *AMICI CURIAE* NONPARTISAN ORGANIZATIONS AND IMPACTED OVERSEAS VOTERS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICI CURIAE* ...............................................1

INTRODUCTION .................................................................................................4

ARGUMENT .........................................................................................................5

    I.     This Lawsuit Jeopardizes Overseas Citizens' Fundamental
Right to Vote, Subverting Well-Established Federal Policy................5

    II.    Plaintiffs' Requested Relief Flies in the Face of the Public
Interest and Risks Silencing Bona Fide Voters Abroad in the
Upcoming Election............................................................................11

    III.   This Action Is Part of a Broader Insidious Strategy to Leverage
the Courts to Sow Doubt, Chaos, and Confusion Over the 2024
Election..............................................................................................14

CONCLUSION ....................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Fulton Cnty. Bd. of Elections & Admin.*,
No 24-CV-006566 (Ga. Sup. Ct. May 22, 2024) ................................................15

*Bartlett v. Strickland*,
556 U.S. 1 (2009) ..................................................................................................9

*Bowyer v. Ducey,*
506 F. Supp. 3d 699 (D. Ariz. 2020) ..................................................................21

*Bush v. Hillsborough Cnty. Canvassing Bd.*,
123 F. Supp. 2d 1305 (N.D. Fla. 2000) ..................................................... 7, 8, 10

*Dunn v. Blumstein*,
405 U.S. 330 (1972) ..............................................................................................9

*Keefer v. Biden*,
2024 WL 1285538 (M.D. Pa. Mar. 26, 2024), *appeal filed*, No. 24-1716 (3d. Cir.
April 23, 2024), *cert. denied before judgment*, 2024 WL 4427541 (U.S. Oct. 7,
2024) ....................................................................................................................16

*Kelly v. Commonwealth*,
663 Pa. 114 (2020) ..............................................................................................18

*Kivett v. N.C. State Bd. of Elections*,
24-cv-031557-910 (N.C. Super. Ct. Oct. 2, 2024) ..............................................15

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................14

*Mancini v. Delaware Cnty.,*
No. 2:24-cv-02425 (E.D. Pa., June 4, 2024) .......................................................16

*Md. Election Integrity, LLC v. Md. State Bd. of Elections*,
2024 WL 2053773 (D. Md. May 8, 2024), *appeal filed*, No. 24-1499 (4th Cir.
May 17, 2024) ......................................................................................................16

*Mich. Republican Party v. Benson*,
24-000165-MZ (Mich. Ct. Cl. Oct. 8, 2024) .......................................................15

*Mussi v. Fontes*,
24-cv-0130 (D. Ariz. June 3, 2024)......................................................................15

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ................................................................................................14

*Republican Nat'l Comm. v. Burgess,*
No. 3:24-cv-00198 (D. Nev. May 3, 2024) ........................................15

*Republican Nat'l Comm. v. Schmidt,*
2024 WL 4406909 (Pa. Oct. 5, 2024) ................................... 16, 18

*Texas v. Pennsylvania,*
No. 155, 2020 WL 7421669 (Dec. 10, 2020).................................17

*Waste Mgmt. of Pa., Inc. v. City of York,*
162 F.R.D. 34 (M.D. Pa. 1995) ...........................................................2

*Wayne Land & Mineral Grp. v. Del. River Basin Comm'n,*
2016 WL 7256945 (M.D. Pa. Dec. 15, 2016) .....................................2

*Wesberry v. Sanders,*
376 U.S. 1 (1964) .................................................................... 9, 10

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008) .............................................................................11

*Wisc. Voters All. v. Pence,*
2021 WL 686359 (D.D.C. Feb. 19, 2021).........................................20

**Statutes**

56 Stat. 753-57 .....................................................................................6

69 Stat. 584-89 .....................................................................................7

89 Stat. 1142-44 ...................................................................................7

Pub. L. No. 111-84...............................................................................8

Pub. L. No. 77-712 ..............................................................................6

Pub. L. No. 84-296...............................................................................7

Pub. L. No. 94-203...............................................................................7

**Other Authorities**

Brett Sholtis, *Pa. Election Integrity Group Met with 2 Architects of 2020 Effort to Overturn Election*, LNP (July 21, 2024),
https://lancasteronline.com/news/politics/pa-election-integrity-group-met-with-2-architects-of-2020-effort-to-overturn-election/article_d477633c-460f-11ef-9d56-2fd754d57cab.html........................................................ 19, 20, 21

Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, Votebeat (Feb. 12, 2024), https://www.votebeat.org/pennsylvania/2024/02/12/heather-honey-pennsylvania-election-integrity-eric/ ..........................................................................................19

Federal Voting Assistance Program, *2020 Overseas Citizen Population Analysis Report* 12 (Sept. 2021), https://www.fvap.gov/uploads/FVAP/Reports/OCPA-2020-Final-Report_20220805.pdf........................................................................12

H.R. Rep. 95-1568 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5759 .....................8

H.R. Rep. 99-765 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009 ........................8

Mike Scarcella, *DC Court Panel Takes No Action Against Minnesota Lawyer in Election Case*, Reuters (Jan. 24, 2024), https://www.reuters.com/legal/legalindustry/dc-court-panel-takes-no-action-against-minnesota-lawyer-election-case-2024-01-24/ ......................................................................................................20

*O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168 (D. Colo. 2021) ................................................................22

Rosalind S. Helderman & Elise Viebeck, *The Last Wall: How Dozens of Judges Across the Political Spectrum Rejected Trump's Efforts to Overturn the Election*, Wash. Post (Dec. 12, 2020), https://tinyurl.com/2rz3uc9x ..................................21

S. 1415, 111th Cong. § 2 (as reported to Senate, July 16, 2009) .............................9

S. Rep. 84-580 (1955), *as reprinted in* 1955 U.S.C.C.A.N. 2778............................7

Shawn Musgrave, *Trump's Big Lie Attorneys Are Back*, The Intercept (Oct. 17, 2024), https://theintercept.com/2024/10/17/trump-lawyers-election-fraud-lawsuits-strategy/ ..................................................................................................19

*State of the Overseas Voter*, Federal Voting Assistance Program, https://www.fvap.gov/ info/reports-surveys/overseas-citizen-population-analysis (last visited Oct. 16, 2024) ....................................................................................12

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* 220 (2023), extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf. ................................................13

**Regulations**

86 Fed. Reg. 13623 (Mar. 7, 2021)..........................................................................10

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici* are nonprofit, nonpartisan organizations that represent the interests of military and overseas voters, along with individuals who live overseas and are registered to vote in Pennsylvania. They have an interest in ensuring that all eligible American voters—and especially uniformed service members stationed away from their homes while serving our country and U.S. citizens living, working, studying, or traveling abroad—can participate in our democracy. *Amici* are deeply concerned that a ruling in Plaintiffs' favor will impose unnecessary barriers to voting and disenfranchise military and other overseas voters, many of whom have voted repeatedly under the procedures Plaintiffs now challenge and have already cast ballots for the upcoming 2024 election.

Organizational *amici* are all nonpartisan. They are not Democratic or Republican or otherwise associated with any other political group. Their members represent the full spectrum of political viewpoints and belong to a range of political parties (or none at all). *Amici* have no desire to be embroiled in this or any other litigation but feel compelled to participate by the stakes at issue. *Amici* believe it should be beyond dispute that members of the military and other American citizens abroad deserve to freely and easily vote in U.S. elections—and that they should not have to participate in a legal action to do so.

U.S. Vote Foundation (US Vote) is a voter assistance organization dedicated to making it easier for all Americans to register to vote and stay active in the electoral process. With a core mission to ensure that every U.S. citizen can participate in democracy regardless of location, US Vote serves as a vital resource for voters facing challenges due to their geographic circumstances. Its Overseas Vote initiative provides easily accessible, nonpartisan voting resources for overseas citizens and military voters who vote under the protections of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).

American Citizens Abroad (ACA) is an advocacy organization that represents the legislative and regulatory concerns of the millions of U.S. citizens living and working overseas to the U.S. Government. ACA engages in advocacy to ensure that voters living overseas can exercise their fundamental right to vote and that voting from overseas can be accomplished in a timely, simple, and straightforward way.

The Association of Americans Resident Overseas (AARO), founded in 1973 and headquartered in Paris, is a global association with members in over 40 countries. AARO works to build awareness of the issues affecting Americans overseas and seeks fair treatment by the U.S. government for Americans abroad. AARO's advocacy in voting led to the promulgation of the Overseas Citizens Voting Rights Act of 1975, which then led to UOCAVA in 1986. AARO assists

U.S. citizens living overseas in the voting process in every federal election and continues to advocate for the removal of the remaining barriers to overseas voting.

Blue Star Families (BSF) is a national organization that works to ensure that American military families feel connected, supported, and empowered to thrive—in every community, across the nation, and around the globe. Founded in 2009, BSF has approximately 300,000 members in its network and reaches more than 1.5 million military family members each year, making it the nation's largest chapter-based military and Veteran family support organization. BSF also conducts research that provides insights into the unique challenges of military and Veteran family life.

Founded in 1931, the Federation of American Women's Clubs Overseas (FAWCO) is an international network of independent volunteer clubs and associations comprising 59 member clubs in 29 countries worldwide—the oldest and largest non-partisan organization representing private sector Americans abroad. FAWCO's U.S. Voting Committee encourages and assists U.S. overseas citizens to participate in every federal election for which they are eligible by providing a dedicated website and information and training to volunteers in FAWCO member clubs. The Committee also works to reduce the barriers to voting from overseas imposed by federal and state legislation.

Maria H. Craig, Thomas Lipton, Ellen Lebelle, Ann Madden, Kristi Carroll-Lorin, Reverand Daniel Morrow, and Teresa Morrow are U.S. citizens living abroad who have voted many times as UOCAVA voters in Pennsylvania. Ms. Craig's voting residence address is in Berks County. Mr. Lipton's voting residence address is in Philadelphia County. Ms. Lebelle's voting residence address is in Philadelphia County. Ms. Madden's voting residence address is in Chester County. Ms. Carroll-Lorin's voting residence address is in Allegheny County. Rev. Morrow and Ms. Morrow's voting residence address is in Cumberland County. Ms. Craig, Mr. Lipton, Ms. Lebelle, Ms. Madden, Ms. Carroll-Lorin, Rev. Morrow, and Ms. Morrow have already submitted UOCAVA ballots in the upcoming election.

## INTRODUCTION

In the guise of defending the upcoming election from voter fraud and interference, Plaintiffs attempt to leverage this Court to launch a voter interference campaign of their own. They bring a legally defective cause of action seeking injunctive relief—premised on a nonexistent voter verification requirement for citizens abroad, coupled with an imaginary threat of widespread electoral manipulation via overseas ballots—with the aim of singling out overseas ballots for extra scrutiny that would effectively disenfranchise American voters living abroad. In so doing, Plaintiffs seek unlawfully to silence the electoral voice of tens of thousands of military and civilian Pennsylvania voters currently stationed and

living outside the United States, many of whom have dedicated their lives to service and civic duty and all of whose fundamental right to vote is entitled to special protections under federal law.  The Court should reject Plaintiffs' efforts to undermine the 2024 General Election.

This brief does not endeavor to address the many legal flaws with Plaintiffs' claim—including their lack of standing, the absence of a private right of action, and their flawed understanding and presentation of U.S. election law—that already have been capably argued by Defendants.  *Amici* instead seek to highlight for this Court the irreconcilable conflict between Plaintiffs' suit and longstanding federal policy supporting the franchise of overseas citizens; to illuminate the stakes of the injunction Plaintiffs request for the voters—be they Democrats, Republicans, or otherwise—whose fundamental rights hang in the balance; and to situate this litigation in its broader context as part of an insidious, concerted campaign to sow chaos, distrust, and confusion ahead of the 2024 General Election.

## ARGUMENT

### I. This Lawsuit Jeopardizes Overseas Citizens' Fundamental Right to Vote, Subverting Well-Established Federal Policy.

With their lawsuit, Plaintiffs threaten to disenfranchise American citizens living abroad, many of whom are away from home serving their country, under the pretense of enforcing a nonexistent voter verification requirement.  These citizens—who span the political spectrum—have a fundamental right to participate

in our country's electoral process, unimpeded by where they happen to reside on Election Day.  But Plaintiffs unjustifiably target their ballots for special scrutiny on the eve of the 2024 General Election—knowing full well that enforcement of an illusory verification requirement would have the practical effect of disenfranchising those overseas voters.

Millions of American citizens live abroad.  They are military families stationed overseas, troops deployed to international conflict zones, embassy personnel and diplomats, and others charged with safeguarding U.S. interests abroad.  They are university students engaging in foreign study, missionaries and volunteers for international aid organizations, retirees experiencing the world, and employees on assignment at posts in other countries.  They are tax-paying American citizens of varying political persuasions who share an interest in the future of this country, just like their stateside peers.  And for those of voting age, and otherwise qualified, their right to vote is sacrosanct.

Congress has long sought to ensure that overseas citizens can fully vindicate their voting rights from abroad.  These efforts date back to 1942, when the Soldier Voting Act was enacted to guarantee the voting rights of troops serving overseas during wartime.  Pub. L. No. 77-712, 56 Stat. 753-57.  The Federal Voting Assistance Act of 1955 (FVAA) followed a decade later, covering an expanded group of overseas citizens (active-duty members of the armed forces and merchant

marine; civilian federal employees serving abroad; members of religious groups or welfare agencies assisting the armed forces; and all of their respective families) and enacting a more detailed set of protections and recommendations for the states to "permit and assist" these groups "to exercise their voting franchise."  Pub. L. No. 84-296, 69 Stat. 584-89.  FVAA was motivated by the "special obligation of the State and Federal Governments" to those "[s]ervice personnel [who] give up many things when they enter the military," and are owed, at minimum, "th[e] opportunity to exercise the free right of suffrage" undisrupted by their service.  S. Rep. 84-580 (1955), *as reprinted in* 1955 U.S.C.C.A.N. 2778, 2779.

The Overseas Citizens Voting Rights Act of 1975 (OCVRA) later bolstered these protections, expressly guaranteeing overseas citizens' right to vote in federal elections and establishing uniform absentee voting procedures, after the states had failed to enact adequate safeguards on their own.  Pub. L. No. 94-203, 89 Stat. 1142-44; *see also Bush v. Hillsborough Cnty. Canvassing Bd*., 123 F. Supp. 2d 1305, 1308 (N.D. Fla. 2000) (reviewing history).  Congress then amended FVAA and OCVRA in 1978, upon finding that many overseas citizens still "cannot exercise their constitutional right to vote in federal elections, or are inhibited from doing so, because of inconsistent and conflicting laws and other impediments imposed by the several states."  H.R. Rep. 95-1568, at 2 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5759, 5760; *Bush*, 123 F. Supp. 2d at 1309.

The most sweeping overseas voting overhaul came in 1986 with the passage of UOCAVA, 52 U.S.C. §§ 20301 *et seq.*, which endowed citizens living abroad with further special voting protections in recognition that participating in elections from outside the United States remained fraught. In passing UOCAVA, Congress reaffirmed the unequivocal policy judgment that it was critical to vindicate the voting rights of American citizens abroad. The "primary purpose" of UOCAVA was "to facilitate absentee voting by United States citizens, both military and civilian, who are overseas." H.R. Rep. 99-765, at 5 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 2009, 2009. In short, the goal of UOCAVA was to make voting easier for this often-overlooked, multi-million person constituency—many of whom had been sent overseas to serve their country, only to lose their vote in the process.

Congress strengthened that commitment yet again in 2009 with the Military and Overseas Voter Empowerment (MOVE) Act, Pub. L. No. 111-84, Subtitle H, §§ 575-589, 123 Stat. 2190, 2318-35, which amended UOCAVA to remove further barriers that had stood in the way of American citizens abroad trying to participate in U.S. elections. Congress based that legislative action on its findings that "[t]he right to vote is a fundamental right," yet "[d]ue to logistical, geographical, operational and environmental barriers, military and overseas voters are burdened by many obstacles that impact their right to vote and register to vote." S. 1415,

111th Cong. § 2 (as reported to Senate, July 16, 2009). Congress further found that the "States play an essential role in facilitating the ability of military and overseas voters to register to vote and have their ballots cast and counted." *Id.*

Each branch of the government has joined Congress in recognizing the sanctity of the right to vote and the importance of safeguarding it for *all* citizens. The Supreme Court has long recognized that "the right to vote" is "one of the most fundamental rights of our citizens." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009); *see also, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."); *accord Bush*, 123 F. Supp. 2d at 1307 ("Voting is a right, not a privilege, and a sacred element of the democratic process."). Indeed, the right to vote is "preservative of all rights." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, 376 U.S. at 17.

The Executive Branch, too, has expressed a policy committed to protecting the voting rights of all citizens, especially those who confront obstacles to their democratic participation. To that end, President Biden issued an Executive Order on Promoting Access to Voting in 2021. Exec. Order No. 14019, 86 Fed. Reg. 13623 (Mar. 7, 2021). That Executive Order pronounced that "[t]he right to vote is the foundation of American democracy," and "[f]ree and fair elections that reflect

the will of the American people must be protected and defended." *Id.* § 1. And it specifically recognized that "[m]embers of our military serving overseas, as well as other American citizens living abroad, [] face challenges to exercising their fundamental right to vote," and ordered that additional measures be established to alleviate those barriers. *Id.* §§ 1, 8.

Plaintiffs' lawsuit flies in the face of this longstanding, cross-partisan commitment to protecting the vote of American citizens of all parties wherever they may reside. And all the more audaciously, it targets for disenfranchisement the American overseas community, many of whom have dedicated their lives to serving this nation as members of the U.S. Armed Forces, foreign service, and otherwise. While every American citizen's right to vote is worthy of protection, it is especially pernicious to silence the voices of military voters who wish to have a say in who will be empowered to send them off to war—when the only reason they cannot vote in person is because they have been sent away from home to serve their country. *Cf. Bush*, 123 F. Supp. 2d at 1307 ("For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion. . . . How and where they conduct their lives is dictated by the government. The vote is their last vestige of expression and should be provided no matter what their location.").

**II.      Plaintiffs' Requested Relief Flies in the Face of the Public Interest and Risks Silencing Bona Fide Voters Abroad in the Upcoming Election.**

While Plaintiffs can muster no viable theory of injury, their lawsuit threatens to inflict real harm on legitimate overseas voters whose ballots may get tossed out or sequestered indefinitely. Plaintiffs feign concern for election integrity, but in reality their suit disrupts that very objective. Its timing makes Plaintiffs' suit all the more pernicious, as they waited until just weeks before the 2024 General Election to file a case that could have been brought over a decade ago. The public interest—an indispensable component of the test for preliminary injunctive relief, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)—weighs conclusively against granting Plaintiffs the relief they seek.

To sow distrust in the upcoming election, Plaintiffs have employed a strategy that impugns the integrity of military and other overseas ballots. They cite their own *ipse dixit*—with no evidence—to suggest that these ballots somehow present a threat of widespread voter fraud or foreign interference. The only ostensible support they proffer actually buttresses the exact opposite proposition: that UOCAVA ballots are *not* easily manipulable. *See* Brief of Democratic Nat'l Comm. & Pa. Democratic Party, ECF No. 29 ("DNC Br."), at 29-30. In so doing, Plaintiffs seek to exploit as pawns in their misguided political game active-duty troops, military families, foreign service members, and others whose lives have been shaped by and evince true patriotic sacrifice. That cannot stand.

Notwithstanding the progress ushered in by reforms like UOCAVA and the MOVE Act, eligible voters living abroad already experience difficulty exercising their right to vote in U.S. elections. The Federal Voting Assistance Program (FVAP) estimates that only 7.8% of voting-age overseas citizens voted in the 2020 General Election, compared to the 79.2% voting rate domestically. Federal Voting Assistance Program, *2020 Overseas Citizen Population Analysis Report* 12, 14 (Sept. 2021), https://www.fvap.gov/uploads/FVAP/Reports/OCPA-2020-Final-Report_20220805.pdf. And in the 2022 General Election, only 3.4% of voting-age overseas citizens cast a ballot, compared to the 62.5% voting rate domestically. *State of the Overseas Voter*, Federal Voting Assistance Program, https://www.fvap.gov/ info/reports-surveys/overseas-citizen-population-analysis (last visited Oct. 16, 2024). According to FVAP, about 10 percent of that voting gap is "attribut[able] to real or perceived obstacles overseas citizens encountered that domestic voters do not face." *Id.*

Unsurprisingly, these obstacles extend to Pennsylvania's UOCAVA electorate. In 2022, Pennsylvania securely transmitted 11,593 UOCAVA ballots to voters who submitted applications—already reflecting a sharp drop-off from the pool of potentially eligible voters. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* 220 (2023), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf. Of

those, only 8,416 ballots were returned. *Id.* And 347 of the returned ballots were rejected for reasons such as mail delay. *Id.* at 208, 220. Yet this lawsuit, and others like it, threatens to disenfranchise even those citizens who managed successfully to jump through the myriad procedural hoops necessary to submit timely ballots from overseas.

Plaintiffs make much of *candidates*' rights in the electoral process—while failing to articulate exactly how those rights are being harmed—but tellingly ignore the rights of American citizens whose votes they effectively seek to purge. Indeed, Plaintiffs ask that all UOCAVA ballots be segregated "until the identity and eligibility of the applicant can be verified," Prayer for Relief ¶ 4, with no explanation of how or when that process could be implemented for voters abroad, from Asia to South America to the Middle East, who cannot simply head over to a local Pennsylvania county board of elections on their lunch break with a copy of their driver's license. Even attempting to make contact with these voters anew would present an often-insurmountable hurdle—whether for troops deployed in combat zones, missionaries serving in remote villages, or everyday citizens who reside in countries with unreliable mail service—which is precisely why there is an early deadline for states to transmit UOCAVA ballots in the first place. Plaintiffs offer no such explanation because they *have* no good answer: Practically speaking,

their ballot segregation request is tantamount to complete voter disenfranchisement.

The American citizens whose votes hang in the balance—and whose "strong interest in exercising the 'fundamental political right' to vote," *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), is being jeopardized—are those with the most meaningful stake in the outcome of this litigation. They deserve a voice in the upcoming election, as they do in this litigation. Silencing that voice—based on an illusory verification requirement with no support in the law, *see* DNC Br. at 17-22; Br. of State Defs., ECF No. 30, at 15-17—certainly is not a path forward to a free and fair election, especially at this extraordinarily late stage in the election cycle. To the contrary, the public interest is best served by rejecting Plaintiffs' requested relief, fulfilling UOCAVA's mandate to support the franchise of citizens abroad regardless of their location or political party affiliation, and "permitting as many qualified voters to vote as possible," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

### III. This Action Is Part of a Broader Insidious Strategy to Leverage the Courts to Sow Doubt, Chaos, and Confusion Over the 2024 Election.

The broader context of Plaintiffs' lawsuit illuminates their true objective—and it is the antithesis of election integrity. This lawsuit is part and parcel of an insidious nationwide effort to undermine confidence in the 2024 General Election just weeks before Election Day and after millions of absentee votes have already

been cast.  This campaign includes equally baseless challenges filed this month in quick succession to statutes in North Carolina and Michigan protecting the franchise of overseas citizens who vote in those states, even though each targeted statute was enacted many years before these sudden challenges and implemented without incident over several election cycles.  *See, e.g.*, Complaint, *Kivett v. N.C. State Bd. of Elections*, 24-cv-031557-910 (N.C. Super. Ct. Oct. 2, 2024) (challenging the constitutionality of a state statute, enacted in 2011, providing voter eligibility to certain U.S. citizens overseas); Complaint, *Mich. Republican Party v. Benson*, 24-000165-MZ (Mich. Ct. Cl. Oct. 8, 2024) (challenging similar state statute).  It is no coincidence, of course, that all three lawsuits attempt to sow doubt and confusion *in critical swing states* for the upcoming presidential election.

These actions, in turn, represent one of several categories of contrived, politically-motivated challenges to different aspects of state election systems that are being marshalled far more quickly than courts are able to evaluate and reject them.  *See, e.g.*, Complaint, *Mussi v. Fontes*, 24-cv-0130 (D. Ariz. June 3, 2024) (challenge to maintenance of voter rolls); Complaint, *Republican Nat'l Comm. v. Burgess,* No. 3:24-cv-00198 (D. Nev. May 3, 2024) (challenge to ballot receipt deadline); Complaint, *Adams v. Fulton Cnty. Bd. of Elections & Admin.*, No 24-CV-006566 (Ga. Sup. Ct. May 22, 2024) (challenge to state certification laws);

Complaint, *Mancini v. Delaware Cnty.,* No. 2:24-cv-02425 (E.D. Pa., June 5, 2024) (challenge to use of election machines).

Although many of these litigations are still ongoing, the majority of courts that to date have issued rulings have dismissed them—and largely for the same reasons set forth in Defendants' briefing and above. *See Republican Nat'l Comm. v. Schmidt*, 2024 WL 4406909, at *1 (Pa. Oct. 5, 2024) (denying petition challenging notice-and-cure procedures for defective absentee and mail-in-ballots "where, as here, the alleged need for timely intervention is created by Petitioners' own failure to proceed expeditiously"); *Md. Election Integrity, LLC v. Md. State Bd. of Elections*, 2024 WL 2053773, at *4 (D. Md. May 8, 2024) (granting motion to dismiss suit alleging voting system vulnerabilities for lack of standing), *appeal filed*, No. 24-1499 (4th Cir. May 17, 2024); *Keefer v. Biden*, 2024 WL 1285538, at *10 (M.D. Pa. Mar. 26, 2024) (dismissing suit challenging executive actions relating to voter registration for lack of standing), *appeal filed*, No. 24-1716 (3d. Cir. April 23, 2024), *cert. denied before judgment,* 2024 WL 4427541 (U.S. Oct. 7, 2024).

That Plaintiffs would, at this unconscionably late stage, attempt to inject the instant challenge to overseas Pennsylvania voting into the *upcoming* election should come as no surprise—they are essentially the same instigators responsible

for the assault on the free and fair administration of elections in Pennsylvania in 2020:

- On January 6, 2020, each of the individual plaintiffs in this action relied on baseless claims of voting fraud and irregularities to object to the counting of Pennsylvania's electoral votes. Moreover, each individual plaintiff (aside from Rep. Smucker) signed on to an *amicus* brief in support of the State of Texas's motion for a preliminary injunction to block the certification of Pennsylvania's electoral votes based on those same baseless claims, a challenge dismissed by the U.S. Supreme Court the following day for lack of standing. *See* Motion for Leave to File Brief *Amicus Curiae* and Brief *Amicus Curiae* of U.S. House of Representative Mike Johnson and 125 Other Members of the U.S. House Representatives in Support of Plaintiffs' Motion for Leave to File a Bill of Complaint and Motion for a Preliminary Injunction, *Texas v. Pennsylvania*, No. 155, 2020 WL 7421669 (Dec. 10, 2020).

- On November 21, 2020, Plaintiff Rep. Mike Kelly petitioned to invalidate nearly 2.5 million mail-in-ballots cast in the 2020 presidential election under Pennsylvania's universal mail-in program, only to be rejected repeatedly in both state and federal court at the trial-court level and on appeal. Notably, the Pennsylvania Supreme Court dismissed Rep.

Kelly's petition under the doctrine of laches, holding Rep. Kelly "waited to commence this litigation until days before the county boards of election were required to certify the election results to the Secretary of the Commonwealth," notwithstanding that the challenged provisions had been in place for more than a year, multiple election cycles had taken place under the statute, and millions of votes had already been cast in the at-issue election under the statute. *Kelly v. Commonwealth*, 663 Pa. 114, 116 (2020).[1]

- The organizational plaintiff in this action—the so-called "PA Fair Elections" group—has coordinated with certain now-discredited lawyers associated with the misguided legal effort to overturn the 2020 presidential election, including attorneys Cleta Mitchell and John Eastman. *See* Brett Sholtis, *Pa. Election Integrity Group Met with 2*

---

[1] In a concurring opinion, Justice Wecht admonished Rep. Kelly and his co-plaintiffs for "play[ing] a dangerous game at the expense of every Pennsylvania voter" by delaying a suit challenging the program until two election cycles had already been conducted under the statute and after votes had been cast. *See Kelly*, 663 Pa. at 123 (2020) (Wecht, J., concurring). This refusal to "lend legitimacy to such transparent and untimely efforts to subvert the will of Pennsylvania voters" applies with even greater force to this case, where Rep. Kelly along with his co-plaintiffs have now waited *more than 12 years and a dozen election cycles* to challenge the statutes with which they now take issue. *Id.*; *see also Schmidt*, 2024 WL 4406909, at *1 (Pa. Oct. 5, 2024) (dismissing challenge to notice-and-cure procedures for defective absentee and mail-in ballots where "[t]hree election cycles have since passed" employing the procedures without challenge).

*Architects of 2020 Effort to Overturn Election*, LNP (July 21, 2024), https://lancasteronline.com/news/politics/pa-election-integrity-group-met-with-2-architects-of-2020-effort-to-overturn-election/article_d477633c-460f-11ef-9d56-2fd754d57cab.html. Mitchell, who faced disciplinary complaints for her role in challenging the 2020 election, admitted to organizing the instant lawsuit. *See* Shawn Musgrave, *Trump's Big Lie Attorneys Are Back*, The Intercept (Oct. 17, 2024), https://theintercept.com/2024/10/17/trump-lawyers-election-fraud-lawsuits-strategy/.

- In November 2020, PA Fair Elections' founder, Heather Honey, falsely claimed that Pennsylvania reported 205,000 more votes than registered voters in the presidential election which, in turn, fueled the legal challenges mounted by the individual plaintiffs in this case, outlined above. *See* Carter Walker, *This Pa. Activist Is the Source of False and Flawed Election Claims Gaining Traction Across the Country*, Votebeat (Feb. 12, 2024), https://www.votebeat.org/pennsylvania/2024/02/12/heather-honey-pennsylvania-election-integrity-eric/. PA Fair Elections now holds weekly public meetings where figures like Honey, Eastman, and Mitchell

regularly air baseless voter-fraud theories that routinely find their way into frivolous lawsuits. *See* Sholtis, *supra.*

- John Kardaal, Plaintiffs' attorney of record, was referred by U.S. District Court Judge James E. Boasberg to a misconduct committee for filing "a sweeping [c]omplaint filled with baseless fraud allegations and tenuous legal claims," that employed "political grandstanding" in place of viable legal theories while "seek[ing] to target processes at the heart of our democracy." *Wisc. Voters All. v. Pence*, 2021 WL 686359, at *2 (D.D.C. Feb. 19, 2021). The committee reportedly determined to take no further action, without explaining its reasoning. Mike Scarcella, *DC Court Panel Takes No Action Against Minnesota Lawyer in Election Case*, Reuters (Jan. 24, 2024), https://www.reuters.com/legal/ legalindustry/dc-court-panel-takes-no-action-against-minnesota-lawyer-election-case-2024-01-24/.

Taken together, this background leaves little doubt that the instant lawsuit is merely the latest in a long line of frivolous election actions filed since the 2020 presidential election that aim, contrary to law, to disenfranchise legitimate American voters and undercut public confidence in the electoral system. *See generally* Rosalind S. Helderman & Elise Viebeck, *The Last Wall: How Dozens of Judges Across the Political Spectrum Rejected Trump's Efforts to Overturn the*

*Election*, Wash. Post (Dec. 12, 2020), https://tinyurl.com/2rz3uc9x (finding that,

"[i]n a remarkable show of near unanimity across the nation's judiciary," at least

86 judges rejected at least one post-election lawsuit).  The Court should treat this

baseless lawsuit no differently.

    *Amici* further submit that the Court has an independent interest in summarily

dismissing this action: preventing Plaintiffs from continuing to conscript the courts

into service as platforms for the further erosion of public confidence in the

electoral system.  *See Bowyer v. Ducey*, 506 F. Supp. 3d 699, 724 (D. Ariz. 2020)

(dismissing case for lack of standing, and noting that "gossip and innuendo cannot

be a substitute for earnest pleadings and procedure in federal court").  Indeed,

Plaintiffs' lawsuit troublingly amplifies videos they allege "demonstrate that bad

actors could easily create and submit falsified [federal absentee ballots]" without

ever acknowledging that the Department of Justice (DOJ) found the videos were

foreign misinformation intended to spread false claims about the election.  *See* Am.

Compl. ¶ 172, ECF No. 23.  PA Fair Elections, in turn, launders this type of

misinformation as fact in its weekly meetings, where group members then discuss

false claims of mail-in voting by "illegals, non-citizens," leading to only more

"panic, outrage and calls for action."  *See* Sholtis, *supra.*  Such allegations, "if

accepted as true by large numbers of people, are the stuff of which violent

insurrections are made."  *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d

1168, 1176 (D. Colo. 2021) (sanctioning attorneys for bringing baseless voter fraud allegations).  Plaintiffs' dangerous effort should summarily be put to rest.

## CONCLUSION

For the reasons set forth above, as well as those presented in the briefing of Defendants and Intervenor-Defendants, Plaintiffs' complaint should be dismissed and their motion for preliminary relief should be denied.

October 18, 2024

Respectfully submitted,

By: _____ /s/ Timothy E. Gates _____

Timothy E. Gates

Stuart Sarnoff*
Javed Yunus*
Danielle Feuer*
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas
Suite 1700
New York, NY 10019
Telephone: +1 212 326 2000
ssarnoff@omm.com
jyunus@omm.com
dfeuer@omm.com

Leah J. Tulin*
Justin Lam*
**BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW**
1140 Connecticut Avenue NW
Suite 1150
Washington, DC 20036
Telephone: +1 202 650 6397
tulinl@brennan.law.nyu.edu
lamju@brennan.law.nyu.edu

Timothy E. Gates (ID No. 202305)
Donna A. Walsh (ID No. 74833)
Richard Armezzanni (ID No. 322804)
**MYERS, BRIER & KELLY, LLP**
240 North Third Street, 5th Floor
Harrisburg, PA 17101
Telephone: +1 717 553 6250
tgates@mbklaw.com
dwalsh@mbklaw.com
rarmezzani@mbklaw.com

Lawrence Norden*
**BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW**
120 Broadway
Suite 1750
New York, NY 10271
Telephone: +1 646 292 8310
nordenl@brennan.law.nyu.edu

*\*Pro hac vice* forthcoming

# CERTIFICATES

I, Timothy E. Gates, hereby certify that a copy of this brief has been served on all counsel of record using the Court's CM/ECF system.

I further certify that this brief contains 4,770 words and therefore complies with Local Rule 7.8(b)(2).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

October 18, 2024                            By:       *_/s/ Timothy E. Gates_*
                                                  Timothy E. Gates