## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GUY RESCHENTHALER**, *et al.*, | : | **CIVIL ACTION NO. 1:24-CV-1671** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **AL SCHMIDT**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

On September 30, 2024—36 days before this November's general election—plaintiffs, Republican members of Pennsylvania's congressional delegation,[1] sued Al Schmidt, Secretary of the Commonwealth, and Jonathan Marks, Deputy Secretary for Elections and Commissions, in their official capacities as administrators of Pennsylvania's elections.  Plaintiffs seek declaratory and injunctive relief "to ensure legal compliance with federal and state law regarding the verification of voter registration applicants' identity and eligibility before accepting and counting ballots from" anyone casting a ballot under the auspices of the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.*  (<u>See</u> Doc. 23 ¶ 2).  The Secretary now moves to dismiss plaintiffs' lawsuit.  We will grant the Secretary's motion.

---

[1] Plaintiffs originally included Congressmen Guy Reschenthaler, Dan Meuser, Glenn "G.T." Thompson, Lloyd Smucker, and Mike Kelly.  Congressman Scott Perry and the group PA Fair Elections were added by amended complaint.

## I.      Factual Background & Procedural History

### A.      UOCAVA, HAVA, and UMOVA

This matter concerns the interplay between Pennsylvania's election laws and two federal statutes.  UOCAVA, among other things, obliges states to "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot" in all elections for federal office. 52 U.S.C. § 20302(a)(1).[2]  The states must "accept and process . . . any otherwise valid voter registration application and absentee ballot application from" a covered voter if it is received at least 30 days before an election.  Id. § 20302(a)(2).  The Act also requires the states to establish procedures to enable covered voters to request and receive voter registration and absentee ballot applications by mail or electronically, id. § 20302(a)(6)(A)-(B), and to transmit "blank absentee ballots" to eligible voters "by mail and electronically," id. § 20302(a)(7); see also id. § 20302(f).

A different federal statute, the Help America Vote Act ("HAVA") of 2002, 52 U.S.C. § 21081 et seq., imposes certain election procedures upon the states pursuant to Congress's constitutional authority to regulate federal elections.  See U.S. Const. art. I, § 4.  The states are required, inter alia, to build computerized

---

[2] UOCAVA defines "absent uniformed services voter" as "a member of a uniformed service on active duty," "a member of the merchant marine," or their spouse or dependent who, for service-related reasons, is absent from the place where they otherwise are qualified to vote.  See 52 U.S.C. § 20310(1)(A)-(C).  An "overseas voter" includes all of the above along with anyone who resides outside of the United States and is qualified or would be qualified (but for their residence) to vote in the last place in which they were domiciled before leaving the country.  See id. § 20310(5)(A)-(C).

voter registration systems and to implement minimum requirements for voters who register by mail.  <u>See generally</u> 52 U.S.C. § 21083.  They must adopt "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns" each one "a unique identifier."  <u>See id.</u> § 21083(a)(1)(A).  And they must also regularly "perform list maintenance" to remove ineligible voters.  <u>See id.</u> § 21083(a)(2).

Relevant here, HAVA provides that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" (a) the applicant's current and valid driver's license number or (b) the last four digits of the applicant's social security number.  <u>See id.</u> § 21083(a)(5)(A)(i)(I)-(II).  Applicants who have not been issued either of those numbers may still register, but they must be assigned an identification number for registration purposes.  <u>See id.</u> § 21083(a)(5)(A)(ii).  HAVA ultimately leaves it to each state to "determine whether the information provided by an individual is sufficient to meet [the foregoing] requirements . . ., in accordance with State law."  <u>See id.</u> § 21083(a)(5)(A)(iii).

HAVA also creates special rules for voters who register to vote by mail but who did not previously vote in a federal election in that state or who did not previously vote in an election in a jurisdiction located in a state that does not maintain a computerized list that complies with the Act (<i>i.e.</i>, "federal voters").  <u>See id.</u> § 21083(b)(1)(A)-(B).  If those voters vote in person, they must present to an

appropriate state or local election official a current and valid photo ID or "a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows" their name and address.  See id. § 21083(b)(2)(A)(i)(I)-(II).  If they vote by mail, they must submit with their ballot a copy of their current and valid photo ID or of one of the other approved documents.  See id. § 21083(b)(2)(A)(ii)(I)-(II).  However, these special rules "shall not apply in the case of a person . . . who is entitled to vote by absentee ballot under" UOCAVA.  See id. § 21083(b)(3)(C)(i).

In 2012, the Commonwealth of Pennsylvania complied with UOCAVA's mandates by adopting the Uniform Military and Overseas Voters Act ("UMOVA"), 25 PA. CONS. STAT. § 3501 *et seq.*  UMOVA effectively extended UOCAVA's procedures for absentee voting in federal elections to state and local races, with some slight differences designed to expand the class of eligible voters.  See id. § 3502.[3]  Covered voters who are registered to vote in Pennsylvania "may apply for a military-overseas ballot using either the absentee ballot application provided under the [Commonwealth's] Election Code or the Federal postcard application."  See id. § 3506(a).  Unregistered covered voters may use the federal postcard application ("FPCA") to simultaneously register to vote and to apply for a military-overseas ballot.  See id. § 3506(b).  Applications may be submitted electronically or by mail

---

[3] UMOVA does not apply to "federal voters," that is, voters who are only eligible to vote in federal elections because they do not satisfy the Commonwealth's eligibility requirements for state and local elections.  See 25 PA. CONS. STAT. § 3502 (defining "covered voter").

"at any time before an election."  See id. §§ 3506(c), 3507(a).  Like HAVA, Pennsylvania's Election Code exempts qualified absentee voters from having to "provide proof of identification" to ensure that their ballot is canvassed "if the elector is entitled to vote by absentee ballot under" UOCAVA.  See 25 PA. STAT. AND CONS. STAT. ANN. § 3146.8(i).

### B.    Plaintiffs' Challenge

Plaintiffs assert that Pennsylvania law requires UOCAVA applicants to "satisf[y] the voter eligibility requirements of the Commonwealth," including its residency requirements.  (See Doc. 23 ¶ 6 (quoting 25 PA. CONS. STAT. § 3502)).  In their view, the Election Code contemplates rejecting UOCAVA applications if an "omission" on the application "prevents election officials from determining whether the UOCAVA applicant is eligible to vote."  (See id. ¶ 7 (citing 25 PA. CONS. STAT. § 3515(a)(1))).  Plaintiffs aver that county election officials must "ascertain from the information on [an absentee ballot] application, district register or **from any other source** that such applicant possesses all the qualifications of a qualified elector other than being registered or enrolled."  (See id. ¶ 8 (quoting 25 PA. STAT. AND CONS. STAT. ANN. § 3146.2b(b)) (plaintiffs' emphasis)).

Plaintiffs contend that the Pennsylvania Department of State has "issued directives and guidance to county officials to exempt UOCAVA applicants entirely from any verification requirements."  (See id. ¶ 9).  They cite Deputy Secretary Marks' testimony before the General Assembly in September 2022 that UOCAVA voters "are specifically exempted from the HAVA verification requirements.  So they do not have to provide the PennDOT ID or last four of SSN.  That's an

exemption both in federal law and I believe state law as well.  So there's no systematic verification."  (See id. ¶¶ 10-11 (quoting Doc. 23-2 (9/14/22 State Gov't Comm. Hr'g Rec. 00:59:45-1:00:11))).  They also cite the Department's October 2023 "Pennsylvania Military and Overseas Voters Guidance," which expresses "[t]he Department's position . . . that covered voters are exempt from the Election Code's ID requirements for absentee voters."  (See id. ¶¶ 12-13 (quoting Doc. 23-5 at 9)). Plaintiffs believe that the Commonwealth's practice in this regard "creates an opportunity for inclusion of ineligible ballots" that might render "the ultimate tally of the votes" inaccurate because UOCAVA applicants theoretically could register to vote, receive absentee ballots (including by email), and cast ballots "without providing identification at any step in the process."  (See id. ¶¶ 17-18).  In the worst-case scenario, plaintiffs submit that these lapses might leave federal elections vulnerable to foreign interference via "falsified FPCAs," which might affect a close congressional election.  (See id. ¶¶ 18-19).

Plaintiffs raise a single count in their amended complaint, which they characterize as "UOCAVA and HAVA Preemption" pursuant to the United States Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2.  (See Doc. 23 ¶¶ 173-201).  They seek a declaratory judgment that the Department's "directives and guidance . . . and any underlying supporting state law purportedly superseding UOCAVA and HAVA's voter registration requirements for" verifying the identity and eligibility of Pennsylvania UOCAVA applicants are preempted by federal law. (See id. at 41-42 ¶ 1).  They also request an injunction (1) barring the Secretary and Deputy Secretary "from any further actions funding, supporting, or facilitating the

directives and guidance"; (2) "instructing Defendants to provide directions to county election officials on the legally mandated procedures to comply with federal and state law in upcoming elections by requiring verification of" UOCAVA applicants' identities and eligibility, including state residency requirements, "prior to accepting and counting the UOCAVA ballots"; and (3) "requiring county election officials to segregate UOCAVA ballots returned for the 2024 election until the identity and eligibility of the applicant can be verified as required under HAVA and state law." (See id. at 42 ¶¶ 2-4).

### C.    Procedural History

Plaintiffs filed a motion for temporary restraining order and preliminary injunction, a supporting brief, and various exhibits contemporaneously with their complaint, which they then amended with leave of court on October 7, 2024. By that date, Pennsylvania authorities had already transmitted more than 25,000 UOCAVA ballots to their intended recipients ahead of the November 5, 2024, general election. (See Doc. 23 ¶ 20). As time was of the essence, we established an expedited schedule for motions practice. We also permitted the Democratic National Committee and the Pennsylvania Democratic Party to intervene over plaintiffs' opposition. And we granted *amici* status to three organizations whose views align with plaintiffs', as well as several groups of nonpartisan, nonprofit organizations who represent the interests of military and overseas voters, along with individual overseas voters who are registered to vote in Pennsylvania and thus have a unique interest in the outcome of this litigation.

The Secretary moved to dismiss plaintiffs' amended complaint on October 11, and he and the intervenors filed briefs in support of dismissal that same day.[4] We held oral argument on the parties' motions on October 18, during which plaintiffs' counsel notably walked back their request for injunctive relief, limiting their prayer to "a prospective declaratory judgment," with the expectation that the parties would then "meet and confer over what would be an appropriate resolution." (See 10/18/24 Hr'g Tr. 21:2-23:3).[5]  The motions are fully briefed and ripe for disposition.

## II.    Legal Standard

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.  See FED. R. CIV. P. 12(b)(1).  Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction.  Lincoln

---

[4] Intervenors filed a consolidated brief in opposition to plaintiffs' motion and in support of a motion to dismiss, (see Doc. 29); however, they never filed a formal dismissal motion of their own and did not expressly tie their brief to the Secretary's motion.  Nonetheless, defendants and intervenors raise the same grounds for dismissal; for simplicity, we will refer to them collectively as "defendants" when discussing their arguments.

[5] In the interest of expediency, the court reporter has provided the court with a rough transcript of the October 18 hearing.  Pagination of the rough transcript may vary from pagination of the official transcript.

Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's burden to establish jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

Courts may grant a Rule 12(b)(1) motion based on the legal insufficiency of a claim only when it appears with certainty that assertion of jurisdiction would be improper.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).  When assessing a facial attack, the court applies the same standard of review as when assessing a motion to dismiss under Rule 12(b)(6).  See Const. Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)).  Courts reviewing facial challenges "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  See Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citing Mortensen, 549 F.2d at 891; Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

**B.    Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  See FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker

v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to

reviewing the facts contained in the complaint, the court may also consider

"exhibits attached to the complaint, matters of public record, [and] undisputedly

authentic documents if the complainant's claims are based upon these documents."

Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit, 998 F.2d

at 1196).

　　　Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

C.    **Rule 12(b)(7)**

Federal Rule of Civil Procedure 12(b)(7) provides for dismissal of a complaint for "failure to join a party under Rule 19." FED. R. CIV. P. 12(b)(7).  Rule 19 promulgates the circumstances in which the joinder of an absent party is necessary and, if such joinder is not feasible, the considerations for assessing whether the absent party is indispensable to the action.  See FED. R. CIV. P. 19; see also Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 107 (1968); Shetter v. Amerada Hess Corp., 14 F.3d 934, 937-38 (3d Cir. 1994).  The moving party bears the burden of showing that the absent party is a required party and thus dismissal is proper under Rule 12(b)(7).  See Disabled in Action v. Se. Pa. Transp. Auth., 635 F.3d 87, 97 (3d Cir. 2011).  As with the other bases for dismissal, the court must accept the truth of the allegations in the complaint and view them in the light most favorable to the non-moving party.  See Polygon U.S. Corp. v. Diversified Info. Technologies, 3:12-CV-0923, 2012 WL 5379168, at *4 (M.D. Pa. Oct. 31, 2012) (citing Cummings v. Allstate Ins. Co., No. 11-2691, 2011 WL 6779321, at *3 (E.D. Pa. Dec. 27, 2011)).  Under Rule 12(b)(7), however, the court may also consider relevant evidence outside the pleadings.  See id.

III.   **Discussion**

Defendants raise several preliminary grounds for dismissal.  They contend that the lawsuit was brought too late, that plaintiffs lack standing to bring this type of claim and failed to sue the proper parties, and that no cause of action exists to sustain the challenge regardless.  (See Doc. 29 at 8-17; Doc. 30 at 7-14, 17-21).  We agree with each of the defendants' arguments for dismissal.

## A.    Laches and <u>Purcell</u>

Defendants invoke two distinct doctrines in contesting the timeliness of plaintiffs' challenge.  The first is laches, "an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another."  <u>Kelly v. Commonwealth</u>, 240 A.3d 1255, 1256 (Pa. 2020) (*per curiam*) (quoting <u>Stilp v. Hafer</u>, 718 A.2d 290, 292 (Pa. 1998)).  To successfully raise a laches defense, a defendant must show inexcusable delay in bringing the lawsuit and resulting harm.  <u>See</u> <u>Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123, 138 (3d Cir. 2005).

The second doctrine is the <u>Purcell</u> principle, pursuant to which federal courts refrain from altering or interfering with the states' election rules and procedures on the eve of an election.  <u>See</u> <u>Purcell v. Gonzalez</u>, 549 U.S. 1 (2006) (*per curiam*); <u>see also</u> <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 589 U.S. 423, 424 (2020) (*per curiam*); <u>Merrill v. Milligan</u>, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (collecting cases).  <u>Purcell</u> urges judicial restraint as election day approaches to avoid confusing voters and election administrators alike.  <u>See</u> <u>Democratic Nat'l Comm. v. Wis. State Legislature</u>, 141 S. Ct. 28, 30-31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay); <u>Kim v. Hanlon</u>, 99 F.4th 140, 160 (3d Cir. 2024).  By discouraging "last-minute litigation," courts protect the states' dual interests "in running [] orderly, efficient election[s] and in giving citizens (including the losing candidates and their supporters) confidence in the [elections'] fairness."  <u>Wis. State Legislature</u>, 141 S. Ct. at 31 (Kavanaugh, J.).

No matter the label—"laches, the <u>Purcell</u> principle, or common sense"—courts "will not disrupt imminent elections absent a powerful reason for doing so." <u>See</u> <u>Crookston v. Johnson</u>, 841 F.3d 396, 398 (6th Cir. 2016). Plaintiffs offer none. Pennsylvania adopted UMOVA in 2012. <u>See</u> Act of Oct. 24, 2012, P.L. 1490, No. 189. Deputy Secretary Marks testified before the General Assembly about the State Department's procedures for military-overseas voters on September 14, 2022. (<u>See</u> Doc. 23-2 (9/14/22 State Gov't Comm. Hr'g Rec.)). And the Department issued its disputed guidance just twelve days later, revising the document slightly in September and October 2023. (<u>See</u> Doc. 23-5 at 9). The individual plaintiffs—each of whom successfully sought federal office several times after the relevant statutes took effect, including at least once since the guidance issued—provide no good excuse for waiting until barely a month before the election to bring this lawsuit.

When asked at oral argument why plaintiffs delayed bringing the instant challenge for more than two years after the State Department promulgated its guidance, plaintiffs' counsel initially responded that the United States Department of Justice had recently unsealed a three-year-old indictment of several Iranians for election interference. (<u>See</u> 10/18/24 Hr'g Tr. 14:6-20). Plaintiffs found that indictment, which was unsealed on September 27, 2024, to be "very concerning" given "the past history of the Iranians having knowledge of how to exploit the UOCAVA voting system, the FPCA, . . . [and] the federal write-in absentee ballots." (<u>See</u> <u>id.</u> at 14:6-20; <u>see also</u> Doc. 23 ¶ 172 (asserting that "Iranian nationals . . . demonstrated that bad actors could easily create and submit falsified FPCAs" to interfere with Pennsylvania's federal elections)). But that charging document

13

reveals no vulnerabilities on the Commonwealth's part.  Indeed, the indictment plainly states that a video "purport[ing] to depict an individual hacking into state voter websites and then using that illicitly obtained voter information to create fraudulent [military-overseas] absentee ballots" was a "simulated intrusion" that did not involve a bona fide state or federal website, adding that the Federal Voting Assistance Program "could not be leveraged in the manner implied by" the video. See United States v. Kazemi, No. 1:21-CR-644, Doc. 2 ¶ 5 (S.D.N.Y. Oct. 21, 2021) (unsealed indictment).  Pressed for anything that might corroborate whether "there's been some Iranian influence over *Pennsylvania's* overseas ballots," counsel effectively conceded that all he had was "concerns."  (See 10/18/24 Hr'g Tr. 14:21-15:1 (emphasis added)).  Plaintiffs cannot rely on phantom fears of foreign malfeasance to excuse their lack of diligence.

The disputed guidance, in which the Department unambiguously declared its official "position" that military-overseas voters "are exempt from the Election Code's ID requirements for absentee voters," (see Doc. 23-5 at 9), was publicly available on the Department's website long before September 27, 2024.  That fact defeats plaintiffs' alternative suggestion that their delay was due to the Department's failure to "give public notice" of the guidance, which counsel asserted necessitated a "hard-nosed investigation" before plaintiffs could discover "this problem in the Pennsylvania election system."  (See 10/18/24 Hr'g Tr. 15:2-25).  A simple Google search might have saved them the time and effort.  See https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-

elections/directives-and-guidance/2023-Pennsylvania-Military-Overseas-Voters-Guidance-2.1.pdf.

As far as prejudice is concerned, the relief plaintiffs desire is a nonstarter. In their amended complaint, plaintiffs sought an order directing the county boards of elections to segregate ballots for potential exclusion and to impose new verification procedures the contours of which plaintiffs themselves have been unable to fully flesh out three weeks into this litigation. (<u>See</u> Doc. 23 at 42 ¶¶ 3, 4). An injunction at this late hour would upend the Commonwealth's carefully laid election administration procedures to the detriment of untold thousands of voters, to say nothing of the state and county administrators who would be expected to implement these new procedures on top of their current duties. Intervenors, who ostensibly represent Democratic military-overseas voters whose votes likely would be threatened, along with party-backed candidates whose prospects might depend on those votes, advance a compelling case for avoiding eleventh-hour tinkering with the Commonwealth's election machinery. The parties and their candidates almost certainly would have to expend vital resources between now and November 11, 2024, the last day for non-military-overseas absentee and mail-in voters in Pennsylvania to submit proof of identification, <u>see</u> 25 PA. CONS. STAT. § 3146.8(h)(2)-(3), to identify and track down affected voters living overseas, educate them about the court's decision, and encourage them to follow up with their respective counties if they want their ballots to count, thereby potentially delaying certification of scores of elections while legal challenges play out. But we need not tempt fate.

Plaintiffs' preferred remedy would hamstring election administrators less than two weeks before the general election and "lead to voter confusion," Kim, 99 F.4th at 160, especially among those covered voters who relied upon public officials' guidance and assurances when registering and casting absentee ballots from abroad.  Laches and Purcell are tailor-made for situations like this one.  See New Pa. Project Educ. Fund v. Schmidt, No. 112 MM 2024, 2024 WL 4410884, at *1 (Pa. Oct. 5, 2024) (per curiam) (declining to "impose []or countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election") (citing Purcell and Crookston, 841 F.3d at 398); see, e.g., West v. Pa. Dep't of State, No. 2:24-CV-1349, 2024 WL 4476497, at * (W.D. Pa. Oct. 10, 2024) (applying Purcell to deny motion for temporary restraining order and preliminary injunction filed 41 days before general election); Mich. Republican Party v. Benson, No. 24-165, at *12-15 (Mich. Ct. Cl. Oct. 21, 2024) (rejecting last-minute challenge to UOCAVA voters on laches grounds in light of "extreme prejudice" that would result).  We will grant defendants' motion to dismiss on this basis.

## B.    Standing and Indispensable Parties

Defendants next dispute plaintiffs' standing to even bring this lawsuit. Article III of the United States Constitution limits federal court jurisdiction to "cases" or "controversies."  U.S. CONST. art. III, § 2.  To establish Article III standing, a plaintiff must demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  For injuries in fact, "a plaintiff must show that he or she

suffered an invasion of a legally protected interest that is concrete and

particularized and actual or imminent, not conjectural or hypothetical." Id. at 339.

Particularized injuries "affect the plaintiff in a personal and individual way." Id.

Defendants argue that the congressional plaintiffs failed to adequately allege

how the Commonwealth's treatment of UOCAVA voters harms their electoral

prospects. We agree. At bottom, plaintiffs claim that "the law . . . has not been

followed," which "is precisely the kind of undifferentiated, generalized grievance"

that the Supreme Court has "refused to countenance." See Lance v. Coffman,

549 U.S. 437, 442 (2007). The hypothetical concerns the individual plaintiffs raise

about the impact of UOCAVA votes in their individual elections are purely

speculative, so their status as candidates, without more, gets them nowhere. That

they would reject a bill to exempt Pennsylvania from UOCAVA and HAVA if one

were put to a vote in the United States House of Representatives, (see Doc. 23 ¶¶ 45-

50), similarly is irrelevant. The Supreme Court has rejected legislative standing on

analogous claims because these kinds of abstract, institutional injuries are not

individualized, but affect all members of a legislative body equally. See Raines

v. Byrd, 521 U.S. 811, 820-30 (1997).

As for the organizational plaintiff, PA Fair Elections, the group does not

identify a single member who has been injured. But even if they had, their claim of

"vote dilution" would be wholly speculative and legally inadequate as well. Our

court of appeals addressed similar claims following the 2020 election and concluded

that voters "lack standing to redress their alleged vote dilution" predicated upon

"state actors counting ballots in violation of state election law" insofar as "that

alleged injury is not concrete [or] particularized for Article III purposes." <u>See</u> <u>Bognet v. Sec'y Commonwealth of Pa.</u>, 980 F.3d 336, 352-54 (3d Cir. 2020), <u>vacated</u> <u>as moot</u> *sub nom.* <u>Bognet v. Degraffenreid</u>, 141 S. Ct. 2508 (2021); <u>see also</u> <u>Donald J.</u> <u>Trump for President, Inc. v. Boockvar</u>, 493 F. Supp. 3d 331, 342 (W.D. Pa. 2020))). Although the Supreme Court ultimately vacated the <u>Bognet</u> court's opinion, it did so only because the case became moot "while on its way" to the High Court.  <u>See</u> <u>Bognet v. Degraffenreid</u>, 141 S. Ct. 2508 (citing <u>United States v. Munsingwear, Inc.</u>, 340 U.S. 36, 39 (1950)).  <u>Bognet</u>'s standing analysis retains persuasive value.

What is more, even if the causal chain was sufficiently concrete and might lead to "inaccurate vote tall[ies]," (<u>see</u> Doc. 23 ¶ 184), plaintiffs' injuries are not "fairly traceable to" the State Department's guidance, nor would they be redressable in this action.  Each of Pennsylvania's county boards of elections is responsible for canvassing ballots—not the Secretary.  <u>See</u> 25 PA. STAT. AND CONS. STAT. ANN. §§ 3146.8, 3154.  In fact, the Secretary "has *no authority* to order the sixty-seven county boards of election to take any particular actions with respect to the receipt of ballots." *In re* <u>Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020</u> <u>Gen. Election</u>, 241 A.3d 1058, 1078 n.6 (Pa. 2020) (emphasis added).  That is why the Supreme Court of Pennsylvania regards the boards as indispensable parties when the relief sought, "if warranted, could be granted solely by and through" them.  <u>See</u> <u>Zimmerman v. Schmidt</u>, --- A.3d ----, 2024 WL 4284202, at *1 (Pa. Sept. 25, 2024) (concluding that neither the Secretary nor the Department was indispensable). Failing to name each board as a defendant recently led the state Supreme Court to vacate a Commonwealth Court decision in an election case because their omission

18

left the lower court without jurisdiction.  See Black Political Empowerment Project v. Schmidt, 322 A.3d 221, 222 (Pa. 2024) (*per curiam*).

The foregoing tenets apply with equal force here.  To the extent plaintiffs persist in their request for injunctive relief, it would not redress their alleged injuries.  We cannot enjoin the Secretary to do anything that would actually affect UOCAVA ballots, more than 25,000 of which were delivered by the time plaintiffs instituted this action in late September.  (See Doc. 23 ¶ 20).[6]  The Secretary has no authority to direct the counties to segregate those ballots or to take steps to verify UOCAVA voters' identities.  See In re Canvass, 241 A.3d at 1078 n.6.  Plaintiffs' prayer for relief makes the county boards indispensable, see Zimmerman, 2024 WL 4284202, at *1, and yet plaintiffs failed to name them even after we raised this issue during our scheduling call on October 4 and granted them leave to amend.  They must now live with that strategic decision.  For these alternative reasons, we will grant the defendants' motion to dismiss on standing and indispensable-party grounds.

### C.    Cause of Action

Lastly, plaintiffs purport to bring this suit under the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, as well as HAVA, but neither of those sources of law affords them a private cause of action.  See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324-25 (2015) ("[T]he

---

[6] We may safely assume that number and the return rate have only grown in the interim.

Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action.") (citations and internal quotation marks omitted); <u>Am. Civil Rights Union v. Phila. City Comm'rs.</u>, 872 F.3d 175, 184 (3d Cir. 2017) ("HAVA does not include a private right of enforcement.").  That does not mean that the rights accorded to voters by HAVA and UOCAVA are illusory or unenforceable. Both statutes authorize the Attorney General of the United States to bring a civil action to enforce their mandates, <u>see</u> 52 U.S.C. § 20307(a); <u>id.</u> § 21111, and HAVA directs states to "establish administrative complaint procedures to remedy grievances" in connection with Subchapter III of the act, <u>id.</u> § 21112(a); <u>see</u> <u>ACRU</u>, 872 F.3d at 181, 184.  The lone organizational plaintiff in this matter brought an administrative complaint that currently is on appeal before the Commonwealth Court of Pennsylvania.  <u>See</u> <u>PA Fair Elections v. Pa. Dep't of State</u>, No. 1512 C.D. 2023 (Pa. Commw.).  They may not rush to federal court to attempt an end-run around that process.  The absence of a cause of action deprives this court of jurisdiction over plaintiffs' case and compels us to grant defendants' motion on this final alternative basis.

**IV.    Conclusion**

Plaintiffs delayed too long to file their action, they lack standing, they have failed to join indispensable parties, and they have failed to articulate a viable cause of action.  Hence, we will grant the Secretary's motion to dismiss plaintiffs' amended complaint without further leave to amend, and we will deny as moot plaintiffs' motion for temporary restraining order and preliminary injunction.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    October 29, 2024